# CITY OF LADUE ET AL. *v.* GILLEO

No. 92–1856.   Argued February 23, 1994—Decided June 13, 1994

STEVENS, J., delivered the opinion for a unanimous Court. O'CONNOR, J., filed a concurring opinion, *post*, p. 59.

*Jordan B. Cherrick* argued the cause for petitioners. With him on the briefs were *Robert F. Schlafly* and *Jay A. Summerville.*

*Gerald P. Greiman* argued the cause for respondent. With him on the brief were *Martin M. Green, Mitchell A. Margo,* and *Steven R. Shapiro.*

*Deputy Solicitor General Bender* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger,* and *Amy L. Wax.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the State of Hawaii et al. by *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Jack Schwartz* and *Diane Krejsa,* Assistant Attorneys General, *Robert A. Marks,* Attorney General of Hawaii, *Pamela Carter,* Attorney General of Indiana, *Jeffrey R. Howard,* Attorney General of New Hampshire, *Fred DeVesa,* Acting Attorney General of New Jersey, *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, and *Jeffrey L. Amestoy,* Attorney General of Vermont; and for the National Institute of Municipal Law Officers et al. by *Richard Ruda* and *Lee Fennell.*

Briefs of *amici curiae* urging affirmance were filed for the American Advertising Federation et al. by *Richard E. Wiley, Lawrence W. Secrest III, Howard H. Bell, John F. Kamp, David S. Versfelt, Kenneth M. Vittor,* and *Slade Metcalf;* for the Association of National Advertisers, Inc., by *Burt Neuborne* and *Gilbert H. Weil;* for People for the American Way

JUSTICE STEVENS delivered the opinion of the Court.

An ordinance of the City of Ladue prohibits homeowners from displaying any signs on their property except "residence identification" signs, "for sale" signs, and signs warning of safety hazards. The ordinance permits commercial establishments, churches, and nonprofit organizations to erect certain signs that are not allowed at residences. The question presented is whether the ordinance violates a Ladue resident's right to free speech.[1]

## I

Respondent Margaret P. Gilleo owns one of the 57 single-family homes in the Willow Hill subdivision of Ladue.[2] On December 8, 1990, she placed on her front lawn a 24- by 36-inch sign printed with the words, "Say No to War in the Persian Gulf, Call Congress Now." After that sign disappeared, Gilleo put up another but it was knocked to the ground. When Gilleo reported these incidents to the police, they advised her that such signs were prohibited in Ladue. The city council denied her petition for a variance.[3] Gilleo then filed this action under 42 U. S. C. § 1983 against the City, the mayor, and members of the city council, alleging that

---

et al. by *Timothy B. Dyk, Elliot M. Mincberg,* and *Marc D. Stern;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

[1] The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." The Fourteenth Amendment makes this limitation applicable to the States, see *Gitlow* v. *New York,* 268 U. S. 652 (1925), and to their political subdivisions, see *Lovell* v. *City of Griffin,* 303 U. S. 444 (1938).

[2] Ladue is a suburb of St. Louis, Missouri. It has a population of almost 9,000, and an area of about 8.5 square miles, of which only 3% is zoned for commercial or industrial use.

[3] The ordinance then in effect gave the city council the authority to "permit a variation in the strict application of the provisions and requirements of this chapter . . . where the public interest will be best served by permitting such variation." App. 72.

Ladue's sign ordinance violated her First Amendment right of free speech.

The District Court issued a preliminary injunction against enforcement of the ordinance. 774 F. Supp. 1559 (ED Mo. 1991). Gilleo then placed an 8.5- by 11-inch sign in the second story window of her home stating, "For Peace in the Gulf." The Ladue City Council responded to the injunction by repealing its ordinance and enacting a replacement.[4] Like its predecessor, the new ordinance contains a general prohibition of "signs" and defines that term broadly.[5] The ordinance prohibits all signs except those that fall within 1 of 10 exemptions. Thus, "residential identification signs" no larger than one square foot are allowed, as are signs advertising "that the property is for sale, lease or exchange" and identifying the owner or agent. §35–10, App. to Pet. for Cert. 45a. Also exempted are signs "for churches, religious institutions, and schools," §35–5, *id.*, at 41a, "[c]ommercial signs in commercially zoned or industrial zoned districts," §35–4, *ibid.*, and on-site signs advertising "gasoline filling

---

[4] The new ordinance eliminates the provision allowing for variances and contains a grandfather clause exempting signs already lawfully in place.

[5] Section 35–2 of the ordinance declares that "No sign shall be erected [or] maintained" in the City except in conformity with the ordinance; §35–3 authorizes the City to remove nonconforming signs. App. to Pet. for Cert. 40a. Section 35–1 defines "sign" as:

"A name, word, letter, writing, identification, description, or illustration which is erected, placed upon, affixed to, painted or represented upon a building or structure, or any part thereof, or in any manner upon a parcel of land or lot, and which publicizes an object, product, place, activity, opinion, person, institution, organization or place of business, or which is used to advertise or promote the interests of any person. The word 'sign' shall also include 'banners', 'pennants', 'insignia', 'bulletin boards', 'ground signs', 'billboard', 'poster billboards', 'illuminated signs', 'projecting signs', 'temporary signs', 'marquees', 'roof signs', 'yard signs', 'electric signs', 'wall signs', and 'window signs', wherever placed out of doors in view of the general public or wherever placed indoors as a window sign." *Id.*, at 39a.

stations,"[6] §35–6, *id.*, at 42a. Unlike its predecessor, the new ordinance contains a lengthy "Declaration of Findings, Policies, Interests, and Purposes," part of which recites that the

> "proliferation of an unlimited number of signs in private, residential, commercial, industrial, and public areas of the City of Ladue would create ugliness, visual blight and clutter, tarnish the natural beauty of the landscape as well as the residential and commercial architecture, impair property values, substantially impinge upon the privacy and special ambience of the community, and may cause safety and traffic hazards to motorists, pedestrians, and children." *Id.*, at 36a.

Gilleo amended her complaint to challenge the new ordinance, which explicitly prohibits window signs like hers. The District Court held the ordinance unconstitutional, 774 F. Supp. 1559 (ED Mo. 1991), and the Court of Appeals affirmed, 986 F. 2d 1180 (CA8 1993). Relying on the plurality opinion in *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490 (1981), the Court of Appeals held the ordinance invalid as a "content based" regulation because the City treated commercial speech more favorably than noncommercial speech and favored some kinds of noncommercial speech over others.

---

[6] The full catalog of exceptions, each subject to special size limitations, is as follows: "[M]unicipal signs"; "[s]ubdivision and residence identification" signs; "[r]oad signs and driveway signs for danger, direction, or identification"; "[h]ealth inspection signs"; "[s]igns for churches, religious institutions, and schools" (subject to regulations set forth in §35–5); "identification signs" for other not-for-profit organizations; signs "identifying the location of public transportation stops"; "[g]round signs advertising the sale or rental of real property," subject to the conditions, set forth in §35–10, that such signs may "not be attached to any tree, fence or utility pole" and may contain only the fact of proposed sale or rental and the seller or agent's name and address or telephone number; "[c]ommercial signs in commercially zoned or industrial zoned districts," subject to restrictions set out elsewhere in the ordinance; and signs that "identif[y] safety hazards." §35–4, *id.*, at 41a, 45a.

986 F. 2d, at 1182. Acknowledging that "Ladue's interests in enacting its ordinance are substantial," the Court of Appeals nevertheless concluded that those interests were "not sufficiently 'compelling' to support a content-based restriction." *Id.*, at 1183–1184 (citing *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 118 (1991)).

We granted the City of Ladue's petition for certiorari, 510 U. S. 809 (1993), and now affirm.

## II

While signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs—just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise. See, *e. g.*, *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989); *Kovacs* v. *Cooper*, 336 U. S. 77 (1949). However, because regulation of a medium inevitably affects communication itself, it is not surprising that we have had occasion to review the constitutionality of municipal ordinances prohibiting the display of certain outdoor signs.

In *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85 (1977), we addressed an ordinance that sought to maintain stable, integrated neighborhoods by prohibiting homeowners from placing "For Sale" or "Sold" signs on their property. Although we recognized the importance of Willingboro's objective, we held that the First Amendment prevented the township from "achieving its goal by restricting the free flow of truthful information." *Id.*, at 95. In some respects *Linmark* is the mirror image of this case. For instead of prohibiting "For Sale" signs without banning any other

signs, Ladue has exempted such signs from an otherwise vir-
tually complete ban. Moreover, whereas in *Linmark* we
noted that the ordinance was not concerned with the promo-
tion of esthetic values unrelated to the content of the prohib-
ited speech, *id.*, at 93–94, here Ladue relies squarely on that
content-neutral justification for its ordinance.

In *Metromedia*, we reviewed an ordinance imposing sub-
stantial prohibitions on outdoor advertising displays within
the city of San Diego in the interest of traffic safety and
esthetics. The ordinance generally banned all except those
advertising "on-site" activities.[7] The Court concluded that
the city's interest in traffic safety and its esthetic interest in
preventing "visual clutter" could justify a prohibition of off-
site commercial billboards even though similar on-site signs
were allowed. 453 U. S., at 511–512.[8] Nevertheless, the
Court's judgment in *Metromedia*, supported by two different
lines of reasoning, invalidated the San Diego ordinance in its
entirety. According to Justice White's plurality opinion, the
ordinance impermissibly discriminated on the basis of con-
tent by permitting on-site commercial speech while broadly
prohibiting noncommercial messages. *Id.*, at 514–515. On

---

[7] The San Diego ordinance defined "on-site signs" as "those 'designating
the name of the owner or occupant of the premises upon which such signs
are placed, or identifying such premises; or signs advertising goods manu-
factured or produced or services rendered on the premises upon which
such signs are placed.'" *Metromedia, Inc.* v. *San Diego*, 453 U. S., at 494.
The plurality read the "on-site" exemption of the San Diego ordinance as
inapplicable to noncommercial messages. See *id.*, at 513. Cf. *id.*, at 535–
536 (Brennan, J., concurring in judgment). The ordinance also exempted
12 categories of displays, including religious signs; for sale signs; signs
on public and commercial vehicles; and "'[t]emporary political campaign
signs.'" *Id.*, at 495, n. 3.

[8] Five Members of the Court joined Part IV of Justice White's opinion,
which approved of the city's decision to prohibit off-site commercial bill-
boards while permitting on-site billboards. None of the three dissenters
disagreed with Part IV. See *id.*, at 541 (STEVENS, J., dissenting in part)
(joining Part IV); *id.*, at 564–565 (Burger, C. J., dissenting); *id.*, at 570
(REHNQUIST, J., dissenting).

the other hand, Justice Brennan, joined by JUSTICE BLACK-MUN, concluded that "the *practical* effect of the San Diego ordinance [was] to eliminate the billboard as an effective medium of communication" for noncommercial messages, and that the city had failed to make the strong showing needed to justify such "content-neutral prohibitions of particular media of communication." *Id.*, at 525–527. The three dissenters also viewed San Diego's ordinance as tantamount to a blanket prohibition of billboards, but would have upheld it because they did not perceive "even a hint of bias or censorship in the city's actions" nor "any reason to believe that the overall communications market in San Diego is inadequate." *Id.*, at 552–553 (STEVENS, J., dissenting in part). See also *id.*, at 563, 566 (Burger, C. J., dissenting); *id.*, at 569–570 (REHNQUIST, J., dissenting).

In *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984), we upheld a Los Angeles ordinance that prohibited the posting of signs on public property. Noting the conclusion shared by seven Justices in *Metromedia* that San Diego's "interest in avoiding visual clutter" was sufficient to justify a prohibition of commercial billboards, 466 U. S., at 806–807, in *Vincent* we upheld the Los Angeles ordinance, which was justified on the same grounds. We rejected the argument that the validity of the city's esthetic interest had been compromised by failing to extend the ban to private property, reasoning that the "private citizen's interest in controlling the use of his own property justifies the disparate treatment." *Id.*, at 811. We also rejected as "misplaced" respondents' reliance on public forum principles, for they had "fail[ed] to demonstrate the existence of a traditional right of access respecting such items as utility poles . . . comparable to that recognized for public streets and parks." *Id.*, at 814.

These decisions identify two analytically distinct grounds for challenging the constitutionality of a municipal ordinance regulating the display of signs. One is that the measure in

effect restricts too little speech because its exemptions discriminate on the basis of the signs' messages. See *Metromedia*, 453 U. S., at 512–517 (opinion of White, J.). Alternatively, such provisions are subject to attack on the ground that they simply prohibit too much protected speech. See *id.*, at 525–534 (Brennan, J., concurring in judgment). The City of Ladue contends, first, that the Court of Appeals' reliance on the former rationale was misplaced because the City's regulatory purposes are content neutral, and, second, that those purposes justify the comprehensiveness of the sign prohibition. A comment on the former contention will help explain why we ultimately base our decision on a rejection of the latter.

## III

While surprising at first glance, the notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles.[9] Thus, an exemption from an otherwise permissible regulation of speech may represent a governmental "attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 785–786 (1978). Alternatively, through the combined operation of a general speech restriction and its exemptions, the government might seek to select the "permissible subjects for public debate" and thereby to "control . . . the search for political truth." *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 538 (1980).[10]

---

[9] Like other classifications, regulatory distinctions among different kinds of speech may fall afoul of the Equal Protection Clause. See, *e. g.*, *Carey* v. *Brown*, 447 U. S. 455, 459–471 (1980) (ordinance that forbade certain kinds of picketing but exempted labor picketing violated Clause); *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 98–102 (1972) (same).

[10] Of course, not every law that turns on the content of speech is invalid. See generally Stone, Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions, 46 U. Chi. L. Rev.

The City argues that its sign ordinance implicates neither of these concerns, and that the Court of Appeals therefore erred in demanding a "compelling" justification for the exemptions. The mix of prohibitions and exemptions in the ordinance, Ladue maintains, reflects legitimate differences among the side effects of various kinds of signs. These differences are only adventitiously connected with content, and supply a sufficient justification, unrelated to the City's approval or disapproval of specific messages, for carving out the specified categories from the general ban. See Brief for Petitioners 18–23. Thus, according to the Declaration of Findings, Policies, Interests, and Purposes supporting the ordinance, the permitted signs, unlike the prohibited signs, are unlikely to contribute to the dangers of "unlimited proliferation" associated with categories of signs that are not inherently limited in number. App. to Pet. for Cert. 37a. Because only a few residents will need to display "for sale" or "for rent" signs at any given time, permitting one such sign per marketed house does not threaten visual clutter. *Ibid.* Because the City has only a few businesses, churches, and schools, the same rationale explains the exemption for on-site commercial and organizational signs. *Ibid.* Moreover, some of the exempted categories (*e. g.,* danger signs) respond to unique public needs to permit certain kinds of speech. *Ibid.* Even if we assume the validity of these arguments, the exemptions in Ladue's ordinance nevertheless shed light on the separate question whether the ordinance prohibits too much speech.

Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale for restricting speech in the first place. See, *e. g.,*

79 (1978). See also *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S., at 545, and n. 2 (STEVENS, J., concurring in judgment).

*Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 424–426 (1993). In this case, at the very least, the exemptions from Ladue's ordinance demonstrate that Ladue has concluded that the interest in allowing certain messages to be conveyed by means of residential signs outweighs the City's esthetic interest in eliminating outdoor signs. Ladue has not imposed a flat ban on signs because it has determined that at least some of them are too vital to be banned.

Under the Court of Appeals' content discrimination rationale, the City might theoretically remove the defects in its ordinance by simply repealing all of the exemptions. If, however, the ordinance is also vulnerable because it prohibits too much speech, that solution would not save it. Moreover, if the prohibitions in Ladue's ordinance are impermissible, resting our decision on its exemptions would afford scant relief for respondent Gilleo. She is primarily concerned not with the scope of the exemptions available in other locations, such as commercial areas and on church property; she asserts a constitutional right to display an antiwar sign at her own home. Therefore, we first ask whether Ladue may properly *prohibit* Gilleo from displaying her sign, and then, only if necessary, consider the separate question whether it was improper for the City simultaneously to *permit* certain other signs. In examining the propriety of Ladue's near-total prohibition of residential signs, we will assume, *arguendo*, the validity of the City's submission that the various exemptions are free of impermissible content or viewpoint discrimination.[11]

---

[11] Because we set to one side the content discrimination question, we need not address the City's argument that the ordinance, although speaking in subject-matter terms, merely targets the "undesirable secondary effects" associated with certain kinds of signs. See *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 49 (1986). The inquiry we undertake below into the adequacy of alternative channels of communication would also apply to a provision justified on those grounds. See *id.*, at 50.

## IV

In *Linmark* we held that the city's interest in maintaining a stable, racially integrated neighborhood was not sufficient to support a prohibition of residential "For Sale" signs. We recognized that even such a narrow sign prohibition would have a deleterious effect on residents' ability to convey important information because alternatives were "far from satisfactory." 431 U. S., at 93. Ladue's sign ordinance is supported principally by the City's interest in minimizing the visual clutter associated with signs, an interest that is concededly valid but certainly no more compelling than the interests at stake in *Linmark*. Moreover, whereas the ordinance in *Linmark* applied only to a form of commercial speech, Ladue's ordinance covers even such absolutely pivotal speech as a sign protesting an imminent governmental decision to go to war.

The impact on free communication of Ladue's broad sign prohibition, moreover, is manifestly greater than in *Linmark*. Gilleo and other residents of Ladue are forbidden to display virtually any "sign" on their property. The ordinance defines that term sweepingly. A prohibition is not always invalid merely because it applies to a sizeable category of speech; the sign ban we upheld in *Vincent*, for example, was quite broad. But in *Vincent* we specifically noted that the category of speech in question—signs placed on public property—was not a "uniquely valuable or important mode of communication," and that there was no evidence that "appellees' ability to communicate effectively is threatened by ever-increasing restrictions on expression." 466 U. S., at 812.

Here, in contrast, Ladue has almost completely foreclosed a venerable means of communication that is both unique and important. It has totally foreclosed that medium to political, religious, or personal messages. Signs that react to a local happening or express a view on a controversial issue both reflect and animate change in the life of a community.

Often placed on lawns or in windows, residential signs play an important part in political campaigns, during which they are displayed to signal the resident's support for particular candidates, parties, or causes.[12] They may not afford the same opportunities for conveying complex ideas as do other media, but residential signs have long been an important and distinct medium of expression.

Our prior decisions have voiced particular concern with laws that foreclose an entire medium of expression. Thus, we have held invalid ordinances that completely banned the distribution of pamphlets within the municipality, *Lovell* v. *City of Griffin*, 303 U. S. 444, 451–452 (1938); handbills on the public streets, *Jamison* v. *Texas*, 318 U. S. 413, 416 (1943); the door-to-door distribution of literature, *Martin* v. *City of Struthers*, 319 U. S. 141, 145–149 (1943); *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147, 164–165 (1939), and live entertainment, *Schad* v. *Mount Ephraim*, 452 U. S. 61, 75–76 (1981). See also *Frisby* v. *Schultz*, 487 U. S. 474, 486 (1988) (picketing focused upon individual residence is "fundamentally different from more generally directed means of communication that may not be completely banned in residential areas"). Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent—by eliminating a common means of speaking, such measures can suppress too much speech.[13]

---

[12] "[S]mall [political campaign] posters have maximum effect when they go up in the windows of homes, for this demonstrates that citizens of the district are supporting your candidate—an impact that money can't buy." D. Simpson, Winning Elections: A Handbook in Participatory Politics 87 (rev. ed. 1981).

[13] See Stone, Content-Neutral Restrictions, 54 U. Chi. L. Rev. 46, 57–58 (1987):

"[T]he Court long has recognized that by limiting the availability of particular means of communication, content-neutral restrictions can significantly impair the ability of individuals to communicate their views to others. . . . To ensure 'the widest possible dissemination of information[,]' [*Associated*

Ladue contends, however, that its ordinance is a mere regulation of the "time, place, or manner" of speech because residents remain free to convey their desired messages by other means, such as *hand-held* signs, "letters, handbills, flyers, telephone calls, newspaper advertisements, bumper stickers, speeches, and neighborhood or community meetings." Brief for Petitioners 41. However, even regulations that do not foreclose an entire medium of expression, but merely shift the time, place, or manner of its use, must "leave open ample alternative channels for communication." *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984). In this case, we are not persuaded that adequate substitutes exist for the important medium of speech that Ladue has closed off.

Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location, such signs provide information about the identity of the "speaker." As an early and eminent student of rhetoric observed, the identity of the speaker is an important component of many attempts to persuade.[14] A sign advocating "Peace in the Gulf" in the front lawn of a retired general or decorated war veteran may provoke a different reaction than the same sign in a 10-year-old child's bedroom window or the same message on a bumper sticker of a passing automobile. An espousal of socialism may carry different implications when displayed

---

*Press* v. *United States*, 326 U. S. 1, 20 (1945),] and the 'unfettered interchange of ideas,' [*Roth* v. *United States*, 354 U. S. 476, 484 (1957),] the first amendment prohibits not only content-based restrictions that censor particular points of view, but also content-neutral restrictions that unduly constrict the opportunities for free expression."

[14] See Aristotle 2, Rhetoric, Book 1, ch. 2, in 8 Great Books of the Western World, Encyclopedia Brittanica 595 (M. Adler ed., 2d ed. 1990) ("We believe good men more fully and more readily than others: this is true generally whatever the question is, and absolutely true where exact certainty is impossible and opinions are divided").

on the grounds of a stately mansion than when pasted on a factory wall or an ambulatory sandwich board.

Residential signs are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute. Cf. *Vincent*, 466 U. S., at 812–813, n. 30; *Anderson* v. *Celebrezze*, 460 U. S. 780, 793–794 (1983); *Martin* v. *City of Struthers*, 319 U. S., at 146; *Milk Wagon Drivers* v. *Meadowmoor Dairies, Inc.*, 312 U. S. 287, 293 (1941). Even for the affluent, the added costs in money or time of taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a hand-held sign may make the difference between participating and not participating in some public debate.[15] Furthermore, a person who puts up a sign at her residence often intends to reach *neighbors*, an audience that could not be reached nearly as well by other means.[16]

---

[15] The precise location of many other kinds of signs (aside from "on-site" signs) is of lesser communicative importance. For example, assuming the audience is similar, a commercial advertiser or campaign publicist is likely to be relatively indifferent between one sign site and another. The elimination of a cheap and handy medium of expression is especially apt to deter *individuals* from communicating their views to the public, for unlike businesses (and even political organizations) individuals generally realize few tangible benefits from such communication. Cf. *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 772, n. 24 (1976) ("Since advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely").

[16] Counsel for Ladue has also cited flags as a viable alternative to signs. Counsel observed that the ordinance does not restrict flags of any stripe, including flags bearing written messages. See Tr. of Oral Arg. 16, 21 (noting that rectangular flags, unlike "pennants" and "banners," are not prohibited by the ordinance). Even assuming that flags are nearly as affordable and legible as signs, we do not think the mere possibility that another medium could be used in an unconventional manner to carry the same messages alters the fact that Ladue has banned a distinct and traditionally important medium of expression. See, *e. g.*, *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147, 163 (1939).

A special respect for individual liberty in the home has long been part of our culture and our law, see, *e. g.*, *Payton v. New York*, 445 U. S. 573, 596–597, and nn. 44–45 (1980); that principle has special resonance when the government seeks to constrain a person's ability to *speak* there. See *Spence v. Washington*, 418 U. S. 405, 406, 409, 411 (1974) *(per curiam)*. Most Americans would be understandably dismayed, given that tradition, to learn that it was illegal to display from their window an 8- by 11-inch sign expressing their political views. Whereas the government's need to mediate among various competing uses, including expressive ones, for public streets and facilities is constant and unavoidable, see *Cox v. New Hampshire*, 312 U. S. 569, 574, 576 (1941); see also *Widmar v. Vincent*, 454 U. S. 263, 278 (1981) (STEVENS, J., concurring in judgment), its need to regulate temperate speech from the home is surely much less pressing, see *Spence*, 418 U. S., at 409.

Our decision that Ladue's ban on almost all residential signs violates the First Amendment by no means leaves the City powerless to address the ills that may be associated with residential signs.[17] It bears mentioning that individual residents themselves have strong incentives to keep their own property values up and to prevent "visual clutter" in their own yards and neighborhoods—incentives markedly different from those of persons who erect signs on others' land, in others' neighborhoods, or on public property. Residents' self-interest diminishes the danger of the "unlimited" proliferation of residential signs that concerns the City of Ladue. We are confident that more temperate measures could in large part satisfy Ladue's stated regulatory needs

---

[17] Nor do we hold that every kind of sign must be permitted in residential areas. Different considerations might well apply, for example, in the case of signs (whether political or otherwise) displayed by residents for a fee, or in the case of off-site commercial advertisements on residential property. We also are not confronted here with mere regulations short of a ban.

without harm to the First Amendment rights of its citizens. As currently framed, however, the ordinance abridges those rights.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE O'CONNOR, concurring.

It is unusual for us, when faced with a regulation that on its face draws content distinctions, to "assume, *arguendo,* the validity of the City's submission that the various exemptions are free of impermissible content or viewpoint discrimination." *Ante,* at 53. With rare exceptions, content discrimination in regulations of the speech of private citizens on private property or in a traditional public forum is presumptively impermissible, and this presumption is a very strong one. *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,* 502 U. S. 105, 115–116 (1991). The normal inquiry that our doctrine dictates is, first, to determine whether a regulation is content based or content neutral, and then, based on the answer to that question, to apply the proper level of scrutiny. See, *e. g., Burson* v. *Freeman,* 504 U. S. 191, 197–198 (1992) (plurality opinion); *Forsyth County* v. *Nationalist Movement,* 505 U. S. 123, 133–135 (1992); *Simon & Schuster, supra,* at 115–116; *Boos* v. *Barry,* 485 U. S. 312, 318–321 (1988) (plurality opinion); *Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221, 229–231 (1987); *Carey* v. *Brown,* 447 U. S. 455, 461–463 (1980); *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95, 98–99 (1972).

Over the years, some cogent criticisms have been leveled at our approach. See, *e. g., R. A. V.* v. *St. Paul,* 505 U. S. 377, 420–422 (1992) (STEVENS, J., concurring in judgment); *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 530, 544–548 (1980) (STEVENS, J., concurring in judgment); Farber, Content Regulation and the First Amendment: A Revisionist View, 68 Geo. L. J. 727 (1980);

Stephan, The First Amendment and Content Discrimination, 68 Va. L. Rev. 203 (1982). And it is quite true that regulations are occasionally struck down because of their content-based nature, even though common sense may suggest that they are entirely reasonable. The content distinctions present in this ordinance may, to some, be a good example of this.

But though our rule has flaws, it has substantial merit as well. It is a rule, in an area where fairly precise rules are better than more discretionary and more subjective balancing tests. See *Hustler Magazine, Inc.* v. *Falwell,* 485 U. S. 46, 52–53 (1988). On a theoretical level, it reflects important insights into the meaning of the free speech principle—for instance, that content-based speech restrictions are especially likely to be improper attempts to value some forms of speech over others, or are particularly susceptible to being used by the government to distort public debate. See, *e. g., ante,* at 51–53; *Mosley, supra,* at 95; Stone, Content Regulation and the First Amendment, 25 Wm. & Mary L. Rev. 189 (1983). On a practical level, it has in application generally led to seemingly sensible results. And, perhaps most importantly, no better alternative has yet come to light.

I would have preferred to apply our normal analytical structure in this case, which may well have required us to examine this law with the scrutiny appropriate to content-based regulations. Perhaps this would have forced us to confront some of the difficulties with the existing doctrine; perhaps it would have shown weaknesses in the rule, and led us to modify it to take into account the special factors this case presents. But such reexamination is part of the process by which our rules evolve and improve.

Nonetheless, I join the Court's opinion, because I agree with its conclusion in Part IV that even if the restriction were content neutral, it would still be invalid, and because I do not think Part III casts any doubt on the propriety of our normal content discrimination inquiry.