**GATEWAY 2000 COUNTRY STORES, INC., Joseph Fullin, and Herman Fullin, Plaintiffs,**

v.

**NORWALK ZONING BOARD OF APPEALS, James Bradley, Mary O. Keegan, Town Clerk, K.C. Senie, City Clerk, and City of Norwalk, Defendants.**

**No. 3:98 CV 679 (GLG).**

United States District Court,
D. Connecticut.

July 7, 1998.

Diane Woodfield Whitney, Lee D. Hoffman, Peter Joseph Vodola, LeBoeuf, Lamb, Greene & MacRae, Hartford, CT, for Plaintiffs.

Peter J. Strassberger, Corporate Counsel, Norwalk, CT, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GOETTEL, District Judge.

Plaintiffs have moved by order to show cause for a preliminary injunction restraining defendants from enforcing or seeking to enforce a provision of the City of Norwalk's Building Zone Regulations ("Regulations"). An evidentiary hearing was held and argument was heard. The following are this Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

Plaintiff Gateway 2000 Country Stores, Inc. ("Gateway Country") operates retail stores in numerous locations selling computers manufactured by its parent company, Gateway 2000, Inc. Since June 1997 it has operated a store on Westport Avenue in Norwalk, Connecticut which it leases from the individual plaintiffs, Joseph and Herman Fullin.

Before occupying the premises, Gateway Country had extensive renovations done to the building as part of which, on April 15, 1997, it filed an application for a building permit. A building permit was issued on that date. Pls.' Ex. 3. In conjunction with the building permit, Gateway Country submitted a number of architectural drawings concerning the changes it was to make to the premises. One drawing showed an existing "pylon" [1] on which Gateway Country proposed to put a new sign that would have black and white colored areas and the name "Gateway Country" preceded by a large logoed golden "G" symbol. Pls.' Ex. 1 (drawing A–6). It also submitted drawings showing, *inter alia*, the storefront and side storefront entrances, both of which were to contain the same sign as appeared on the pylon with additional letters below saying "Personal Computers." Pls.' Ex. 2 (drawing A–4). These signs were to be placed on two "awnings." [2] The "awnings" merely refer to a sign placed on the side of the building having no other functional purpose.

While defendants argue that Gateway Country failed to obtain a building permit for the reconstruction of the awnings (and possibly for the pylon), we find that Gateway Country did in fact obtain such a building permit. What Gateway Country did not obtain, however, was zoning approval for the signs it placed on the pylon and the awnings.

---

1. This pylon is not of a type with which that word is usually associated. Rather, it is an elevated sign on two stanchions.

2. An awning is defined as usually being a "canvas rooflike cover extended over or before any place as a shelter from the sun, rain, or wind." Webster's Third New International Dictionary 153 (1971). We suspect that the term is used for signs appended to the side of businesses because at one time such signs were placed on actual awnings.

(The head of its general building contractor firm testified that he thought the subcontractors doing the lettering work would obtain such zoning approval, but it is clear that they did not).

Norwalk adopted the subject Regulations on June 28, 1985. The pylon had been erected before that time but the Regulations state, *inter alia,* that "[n]o nonconforming sign shall be altered or changed in any way unless it is made to conform to these regulations." Pls.' Mem., Ex. 1 § 118–1292(E). After the Regulations went into effect, another tenant occupied the building and changed the name on the pylon. So far as we are told, this did not result in any City action. However, when Gateway Country began preparing to open the building, it was advised by the zoning inspector's office that the pylon sign it had installed violated the Regulations and demanded that it remove the sign. Initially, this dispute was resolved by covering the sign with a tarpaulin. Then Gateway Country obtained a temporary permit allowing the sign to be uncovered for one month. After one month, however, the City issued a notice of violation as to the pylon sign.

The new awnings created by Gateway Country are bigger than those used by the prior tenant. Besides the signage portion setting forth the name of the store and its product, the awnings extended in both directions outward with a series of black "cow spots" [3] on a white surface. Gateway Country's parent characterizes these stylized logos as a trademark and as a service mark. Section 118–1291 of the Regulations defines "sign" in rather broad terms:

> SIGN—Includes any fabricated sign or outdoor display structure consisting of any letter, figure, character, mark, point, plane, marquee sign, design, poster, pictorial picture stroke, stripe, line, trademark, reading matter or illuminating device, constructed, attached, erected, fastened or manufactured in any manner whatsoever, so that the same shall be used for the attraction of the public to any place, subject, person, firm, corporation, public per-

formance, article, machine or merchandise whatsoever and displayed in any manner out of doors for recognized advertising purposes.

*Id.* § 118–1291. According to this definition, the "cow spots" appear to be both a pictorial picture stroke and a trademark. As such, the size of the awnings exceeded the permitted sign area, and the City issued a notice of violation.

Gateway Country filed an application with the Norwalk Zoning Board of Appeals ("Board of Appeals") for two variances and two appeals from notices of violation. The first variance requested that it be allowed to use its trademarked golden G symbol at a height of forty-five inches (rather than the twenty-four inches allowed) on the front and side of the building and the pylon. Gateway Country argued that its trademark logo consists of a combination of the golden G symbol and the lettering. It also contends that the logo includes the proportions of the symbol and the letters. Thus, it asserts that it could not make the G symbol smaller without diluting the trademark because it would require that the other letters be much smaller than is adequate to identify the building. It noted that other businesses in the area had similar uses. Pls.' Mem., Ex. 2.

The second variance requested an increase in the allowable sign square footage from twenty-five square feet to 85.25 square feet on one side. Gateway Country noted that the sign on the front of the building was only half as long as allowed and that the sign on the side (which is truly the main entrance of the building) is equally important so that additional size should be allowed. Moreover, Gateway Country indicated that the two signs on the front and side, put together, would not total more area than allowed by the Regulations.

With respect to the appeal regarding the awnings, Gateway Country argued that the awnings should not be treated as signs and that, in any event, it had made some changes to comply with the notice of violation. It further contended that there were other

---

**3.** These spots are not the usual type of round spots. Rather, like those of the Holstein cows, they have a free-form shape.

businesses in the area with similar awning designs. The Regulations contain no criteria relating to color schemes or patterns. It does not appear, however, that Norwalk objected to the color scheme, pattern, or wording, but rather to the total size of the awnings.

Concerning the appeal on the pylon, Gateway Country asserted that the pylon had become a legal nonconforming use and claimed that the change in wording was constitutionally protected. It also argued that prohibiting a change of the sign would amount to a taking of a property right without just compensation.

The Board of Appeals denied the two applications and the two appeals without opinion. We therefore have no basis upon which to evaluate the reasonableness of its determination, but that may well be an issue for the state courts and not the federal courts. After the Board of Appeals' action, this appeal followed.

### CONCLUSIONS OF LAW

 In the Second Circuit, the settled standard for preliminary injunctive relief requires the moving party to establish:

> 1) that it is subject to irreparable harm; and 2) either a) that it will likely succeed on the merits or b) that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and that a balancing of the hardships tips "decidedly" in favor of the moving party.

*Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997); *see Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). If the injunction sought would stay government action taken in the public interest pursuant to a regulatory scheme, the movant must meet the more rigorous "likelihood of success" prong. *See Bery v. City of New York,* 97 F.3d 689, 694 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997).

Plaintiffs argue that any interference with their First Amendment rights is *per se* irreparable harm requiring injunctive relief. Specifically, they assert that they are caught between the option of giving up their freedom of expression or of violating the law. Conversely, defendants contend that an injunction is premature and is also unnecessary because plaintiffs cannot demonstrate irreparable harm.

During the last seventeen years, the issue of zoning enforcement of commercial signs has been before the Supreme Court on several occasions. One of the first cases was *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), which involved a City of San Diego ordinance that imposed substantial prohibitions on the erection of outdoor advertising displays. The ordinance permitted on-site commercial advertising but forbade other advertisements unless allowed by one of twelve specified exceptions. The plaintiffs, companies engaged in the outdoor advertising business in the City, brought suit in state court to enjoin enforcement of the ordinance. In the resulting plurality decision, the Supreme Court relied on the approach adopted in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). 453 U.S. at 507, 101 S.Ct. 2882. In *Central Hudson,* the Court held that the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." 447 U.S. at 562–63, 100 S.Ct. 2343. It also held that the protection available for a particular commercial expression depends on the nature of the expression and the governmental interests served by its regulations. *Id.* at 563, 100 S.Ct. 2343. Based on the four-prong test set forth in *Central Hudson,* four Justices in *Metromedia* found that a city's appearance and traffic safety are substantial governmental goals. 453 U.S. at 507–08, 101 S.Ct. 2882. They further concluded that the ordinance in question served those goals and was no broader than necessary to accomplish those ends. *Id.* at 508, 101 S.Ct. 2882. With respect to the City's general ban on signs carrying noncommercial advertising, however, the plurality held that the ordinance was invalid under both the First and Fourteenth Amendments. *Id.* at 512–17, 101 S.Ct. 2882. According to the plurality, if the ordinance's specific exceptions permitted some noncommercial mes-

sages to be conveyed on billboards in commercial and industrial zones, the City must also allow the use of billboards conveying other noncommercial messages throughout those zones. *Id.* at 515, 101 S.Ct. 2882. It was, therefore, not a reasonable time, place, and manner restriction.

Two additional Justices concluded that the practical effect of the City's ordinance constituted a total ban on the use of billboards to communicate to the public messages of general applicability, whether commercial or noncommercial. *Id.* at 525–26, 101 S.Ct. 2882. They found that the City's ordinance was invalid because the City failed to demonstrate that the billboards impaired traffic safety. *Id.* at 528, 101 S.Ct. 2882. They also stated that the ordinance was not sufficiently narrowly drawn to accomplish its traffic safety goal. *Id.* at 529, 101 S.Ct. 2882. Finally, they determined that the City failed to show that its interests in esthetics was substantial in commercial and industrial areas. *Id.* at 530, 101 S.Ct. 2882.

The next significant Supreme Court decision was *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). The Los Angeles Municipal Code prohibited posting signs on public property. A group of supporters for a candidate for election had cardboard signs produced and attached to utility poles. After city employees removed these posters, the taxpayer group sued claiming an abridgement of their right to freedom of speech under the First Amendment. The Court found that there was no First Amendment violation because the ordinance was silent concerning the signs' content (i.e., the speakers' point of view), and it was applied to all in an evenhanded manner. 466 U.S. at 804, 104 S.Ct. 2118. Additionally, the Court stated that it was in the City's constitutional power to attempt to improve its appearance and that this interest was unrelated to the suppression of ideas, *id.* at 805, 104 S.Ct. 2118, because municipalities have a weighty, esthetic interest in "proscribing intrusive and unpleasant formats for expression." *Id.* at 806, 104 S.Ct. 2118. Finally, the Court noted that the elimination of signs on public property did not require extending the ban to private property because a private citizen's interest "in controlling the use of his own property justified the disparate treatment." *Id.* at 811, 104 S.Ct. 2118.

In *City of Ladue v. Gilleo*, 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), the Court addressed the question of residential signs. The City Council enacted an ordinance, banning all residential signs except those falling within one of ten exemptions, for the purpose of minimizing visual clutter. 512 U.S. at 46–47, 114 S.Ct. 2038. Plaintiff Gilleo alleged that the ordinance violated her right to free speech by prohibiting her from displaying a sign reading "For Peace in the Gulf" in the window of her home. Relying on the plurality opinion in *Metromedia*, the lower appellate court held that the ordinance constituted an impermissible "content based" regulation which violated the First Amendment. The court reasoned that the City treated commercial speech more favorably than noncommercial speech and favored some kinds of noncommercial speech over others. *Id.* at 47, 114 S.Ct. 2038. The Supreme Court noted, however, that "[i]t is common ground that governments may regulate the physical characteristics of signs—just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise." *Id.* at 48, 114 S.Ct. 2038. The Court then distinguished *Vincent* from *Metromedia* by noting that in *Vincent*, it rejected the argument that the validity of the City's esthetic interest had been compromised by not extending the ban to private property because, as noted above, a private citizen's interest in controlling the use of his own property justified the disparate treatment. *Id.* at 50–51, 114 S.Ct. 2038. Consequently, the Court held that the ordinance violated the resident's right to free speech because, although there was a valid municipal interest in minimizing visual clutter, it almost completely foreclosed an important and distinct medium of expression for political and personal messages. *Id.* at 54, 114 S.Ct. 2038.

The Supreme Court has not considered the issue of commercial signs in the last four years. However, the Ninth Circuit Court of Appeals addressed that issue in *Blockbuster Videos, Inc. v. City of Tempe*, 141 F.3d 1295

(9th Cir.1998), which involved storefront signs incorporating registered service marks. The City of Tempe's ordinance provided that commercial, exterior signs in shopping centers must conform to the center's "sign package" which specified such things as size, color, and location of signs. The sign package often specified the use of colors that were not consistent with the service marks of the plaintiffs, two retail video store chains. The plaintiffs argued that these sign packages interfered with the lawful use of their registered marks by making it difficult for customers to recognize their advertising. The Ninth Circuit held that:

> a zoning ordinance may not require a change in a registered mark. A zoning ordinance may, however, preclude the display of a mark, as Tempe did when it precluded Blockbuster from constructing its awning on the exterior of its leased building in the shopping center. Precluding display of a mark for zoning purposes is permissible; requiring alteration of a mark is not.

141 F.3d at 1300.

In this case, plaintiffs argue that the Regulations are content based and that a regulation linking a sign's eligibility to the nature of the message it carries is obviously content based. *Ackerley Communications of Mass., Inc. v. City of Somerville*, 878 F.2d 513, 518 n. 9 (1st Cir.1989). Relying on section 118–1292(E), which provides that "[n]o nonconforming sign shall be altered or changed in any way" unless the alteration or change cures the nonconformity, and which defines change as including a new name (with certain exceptions), plaintiffs contend that the Regulations are content based because section 118–1292(E) refers only to name changes but allows all other types of changes. That would seem to be a misreading of the Regulations. Section 118–1292(E) indicates that *even* a name change constitutes a new sign, and therefore requires zoning approval. It does not mean that other types of new signs are not covered by the Regulations. Accordingly, we interpret the Regulations as being non-content based. Instead, we find that the Regulations are di-

rected to the size of the signs and the letters on the signs.

Plaintiffs also contend that the City has failed to show a compelling necessary interest, and that the Regulations are not narrowly tailored to meet the requirements of the Supreme Court cases. The Regulations state that their purpose is to permit signs that do not "confuse or obstruct the vision necessary for traffic safety or otherwise endanger public health, safety and morals and to regulate signs in such a way as to protect property values, to improve the physical appearance of commercial areas and to preserve and enhance the aesthetics of the community." Pls.' Mem., Ex. 1 § 118–1290. Because Gateway Country's signs do not constitute a traffic safety hazard, they raise only esthetic considerations. While this may not be a compelling interest, it is a substantial governmental interest. *Vincent,* 466 U.S. at 806, 104 S.Ct. 2118; *see Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 623–24, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (stating that courts must apply an intermediate level of scrutiny to cases involving restrictions on commercial speech).

Another difficult issue presented is whether the size of the awnings includes the larger portion of the awnings containing the cow spot decorations mentioned earlier. We find that it does because Gateway Country claims that these cow spots are part of its trademarked logo. The *Blockbuster* case indicates that the City cannot compel a change to the logo, but nothing prevents it from considering the logo as part of a sign and precluding its display.141 F.3d at 1300.

### CONCLUSION

This case presents several difficult issues not easily resolved on the papers and the limited evidence presented at the hearing on plaintiffs' application for a preliminary injunction. A trial of this matter has been scheduled for the middle of September, some two and one-half months away. At the present time, Gateway Country has on display the sign portion of its awnings and all of its sign and logo on the pylon. It is not losing any business because of the violations filed against it or the City's refusal to grant it

variances. Plaintiffs argue that they are nevertheless faced with the threat of fines or enforcement action. The cursory opposition filed by defendants does include one important statement in its conclusion: "The City of Norwalk plans to take no enforcement action against the content of Gateway's signs, prior to the conclusion of this case." Defs.' Mem. at 6. Whether fines might ultimately be appropriate because of plaintiffs' failure to obtain zoning approval is something the Court can address after trial. For the moment, however, we determine only that plaintiffs are not faced with irreparable harm. Consequently, we DENY plaintiffs' motion for a preliminary injunction (Doc. # 11) for that sole reason.

**SO ORDERED.**