**PAYLESS SHOESOURCE, INC., Plaintiff,**

v.

**TOWN OF PENFIELD, NEW YORK, Penfield Zoning Board of Appeals, and Harold Morehouse, Defendants.**

No. 96–CV–6125L.

United States District Court, W.D. New York.

Aug. 26, 1996.

Kevin S. Cooman, Zicari, McConville, Cooman, Morin & Welch, Rochester, NY, for plaintiff.

Joseph A. Platania, Theresa Conroy, Rochester, NY, for defendants.

*DECISION AND ORDER*

LARIMER, Chief Judge.

Payless ShoeSource, Inc. ("plaintiff") brings this action, pursuant to § 1121(b) of the Lanham Act, against the Town of Penfield ("Town"), the Penfield Zoning Board of Appeals ("Board"), and Town Building Inspector Harold Morehouse ("Morehouse") (collectively "defendants"), alleging unlawful interference with its trademark.

## FACTUAL BACKGROUND

Plaintiff, who operates two retail stores in Penfield, has a trademark registered with the United States Patent and Trademark Office. This mark consists of the distinctively lettered name "Payless ShoeSource" displayed in yellow, except for the two "o"s contained therein which are displayed in orange.

One of plaintiff's stores is located in Baytowne Plaza. According to existing sign restrictions at this plaza, plaintiff's sign is required to be either yellow, red, or white. Plaintiff, however, disregarded these restrictions and erected a two-colored sign reflecting its trademark.

In April 1995, Morehouse demanded that plaintiff change its sign to a single Board-approved color or seek a variance. Plaintiff applied for a variance. The Board, however, denied its application. To date, plaintiff has not brought its Baytowne Plaza sign into compliance.

Plaintiff's other store is located in Panorama Plaza. Sign restrictions imposed on this plaza require that all signs be red. Plaintiff has complied with this requirement, displaying an all red sign, rather than a sign that reflects its yellow and orange trademark. Although plaintiff would like to display its two-colored trademark at Panorama Plaza, it has not applied for a variance in light of the Board's decision regarding the Baytowne Plaza store.

Plaintiff commenced this action, maintaining that the sign restrictions at Baytowne and Panorama Plazas constitute an unlawful interference with its trademark in violation of § 1121(b) of the Lanham Act, which prohibits a state or one of its subdivisions from requiring the "alteration" of a federally registered mark.

Defendants move, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief can be granted. Defendants maintain that § 1121(b) of the Lanham Act was not intended to interfere with uniform aesthetic zoning requirements, enacted pursuant to a town's police power, that indirectly affect a trademark.

Plaintiff cross-moves for summary judgment, arguing that the plain language of § 1121(b) forbids a town, as a political subdivision, from requiring alteration of a registered trademark.

Because both parties have submitted, and I have considered, matters outside the pleadings, I will treat these motions as motions for summary judgment. Fed.R.Civ.P. 12(b).

## DISCUSSION

Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir.1994).

Here, the parties agree that there are no material issues of fact in dispute and that resolution of this matter depends solely on whether § 1121(b) preempts a town's authority to regulate signs for aesthetic purposes when those signs involve federally registered trademarks.

### I. Authority to Regulate Signs for Aesthetic Purposes

The law in New York is well settled that a town, pursuant to its police power, may impose sign restrictions in order to regulate aesthetics.

For example, in *People v. Goodman*, 31 N.Y.2d 262, 338 N.Y.S.2d 97, 290 N.E.2d 139

(1972), the New York State Court of Appeals noted that a "State and its political subdivisions may regulate the erection and maintenance of outdoor advertising under the police power ... and that villages are empowered by statute to regulate the maintenance of advertising media near streets and in public places ... and to adopt ordinances for general purposes consistent with the exercise of the police power...." *Id.* at 265, 338 N.Y.S.2d 97, 290 N.E.2d 139 (citations omitted).

The Court stated further that "[i]t is now settled that aesthetics is a valid subject of legislative concern and that reasonable legislation designed to promote the governmental interest in preserving the appearance of the community represents a valid and permissible exercise of the police power.... Under the police power, billboards and signs may be regulated for aesthetic purposes." *Id.* (citations omitted); *see also Suffolk Outdoor Advertising Co., Inc. v. Hulse*, 43 N.Y.2d 483, 489, 402 N.Y.S.2d 368, 373 N.E.2d 263 (1977); *Philanz Oldsmobile, Inc. v. Keating*, 51 A.D.2d 437, 440, 381 N.Y.S.2d 916 (4th Dep't 1976); *People v. Rubin*, 162 Misc.2d 104, 106, 616 N.Y.S.2d 166 (Just.Ct. Nassau County 1994).

█ Plaintiff recognizes that the Town of Penfield, pursuant to its police power, generally may regulate signs for aesthetic purposes. However, plaintiff contends that because the Town's regulations preclude it from erecting and maintaining signs with the two colors (yellow and orange) that are part of its federally registered trademark, the Town violates the plain language of § 1121(b) of the Lanham Act. I disagree.

### II. Section 1121(b) of the Lanham Act

Section 1121(b) of the Lanham Act provides: "No State ... or any political subdivision ... may require alteration of a registered mark...." 15 U.S.C. § 1121(b).

#### A. The "Century 21" Amendment

Section 1121(b), which was added to the Lanham Act in 1982, is commonly referred to as the "Century 21" amendment because it was enacted in response to the problems

encountered by Century 21, a national franchisor, when several states required it to alter the display of its federally registered trademark.

Century 21's registered trademark designated 80% of the mark's surface area for the display of the Century 21 logo and the remaining 20% for the display of the local franchisee's name.

Nevada's Real Estate Advisory Commission enacted regulations that required all real estate brokers to display their national logo on 50% of the mark's surface area and display the local franchisee's name on the remaining 50%. This regulation, therefore, required Century 21 brokers to alter their federally registered trademark to display the franchisee's name as prominently as the Century 21 logo. This regulation applied across the board to all items on which the trademark was displayed in Nevada, including signs, letterheads, business cards, brochures, uniforms, name tags, folders, checks, forms, memo pads, desk plates, display materials, marketing materials, advertisements, etc.

Century 21 brought suit in federal court against the Nevada Real Estate Advisory Commission in an attempt to have the regulation declared invalid under the Lanham Act. The district court held, however, that the state regulation did not violate the provisions of the Lanham Act. *Century 21 Real Estate Corp. v. Nevada Real Estate Advisory Comm'n*, 448 F.Supp. 1237 (D.Nev.1978), *aff'd*, 440 U.S. 941, 99 S.Ct. 1415, 59 L.Ed.2d 630 (1979). According to the court, the "Lanham Act contains no manifestation of a Congressional intent comprehensively to control all aspects of the trademark field." *Id.* at 1241.

In the aftermath of the decision, other states adopted various rules requiring different percentages of the trademark to be devoted to the name of the local franchisee. These rules inhibited nationwide advertising campaigns, increased costs, and made the franchisor-franchisee relationship less appealing.

Section 1121(b) was intended to be the legislative remedy for this situation by providing that "[n]o State ... or any political subdivision ... may require alteration of a registered mark." 15 U.S.C. § 1121(b). It is the meaning of this provision that is at the core of the dispute in this action.

## B. Statutory Construction

The starting point for "determining the intended meaning of a statutory provision is, of course, the language of the statute." *Berger v. Heckler*, 771 F.2d 1556, 1570 (2d Cir. 1985). The plain language of § 1121(b) arguably supports plaintiff's position that the Town may not require *any alteration* of its mark. However, the precise meaning of the term "alteration" and whether aesthetic zoning constitutes such an alteration are not entirely clear from the language of the statute.

■ "[W]here the scope of a statutory provision is not made crystal clear by the language of the provision, it is appropriate to turn to the legislative history of the statute." *Id.* at 1571. Further, legislative history may be consulted to determine whether a literal application of the statute would contravene its overarching purpose. *Id.*

■ The legislative history of § 1121(b) is unequivocal that aesthetic zoning does not constitute an "alteration" of a registered mark within the meaning of the statute. The section simply was not intended "to interfere with local aesthetic or hist[o]ric-type zoning," but was aimed only at prohibiting the actual alteration of the mark itself. *Lanham Trademark Act Amendment: Hearings on H.R. 5154 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary*, 97th Cong., 2d Sess. 39–18 (1982) (Statement of Rep. Barney Frank).

In his opening remarks at the Congressional hearings, Gerald J. Mossinghoff, Commissioner of Patents and Trademarks, stated that the purpose of the amendment was to "prohibit any State from requiring that a registered trademark be altered for use within such State." *Id.* at 39–11. He added that the amendment "would not interfere with the power of States ... to regulate the display of advertising of any kind or to limit the dimensions or location of signs." *Id.* at 39–13.

Congressman Barney Frank, one of the co-sponsors of the bill, directed the following question to Mossinghoff:

> **Frank:** I just have one question, I just want to double check on this. I have spoken to the people at Century 21 about this. I am very much in support of the bill, with one understanding that I would like to get clear and that is that nothing in this would be meant to interfere with local aesthetic or hist[o]ric-type zoning, so that if there was a uniform requirement in a particular locality—we have many in Massachusetts—which required that any sign had to conform to a certain type, that nothing in this would be preemptive of that.
>
> I am wondering whether you think we need any language to do that. That would be something I would feel very strongly about, and I would think it would be non-controversial. I do not think we would say that any one trademark would have an override of an otherwise uniform aesthetic or historic zoning that had been established by valid local procedures.
>
> **Mossinghoff:** We share that concern also and indeed have proposed an amendment to make sure that the main thrust of the bill is not to require the altering of a registered trademark.
>
> As we discussed with the chairman, I think it will be clear that those kinds of zoning would not be adversely affected by the legislation.

*Id.* at 39–18.

Congressman Frank also specifically addressed the issue of whether uniform sign restrictions, including restrictions on color, would be affected by the amendment:

> **Frank:** I know that there are areas, I believe there are areas where they require that all signs be of a certain type of lettering. I would not want there to be an override for one particular group here. That is, if everything had to be in gothic lettering it would seem to me that we would not want an outdoor sign that would not include that. I would not think that would be the purpose. I would not want to support legislation that would do that.
>
> I am trying to think of those I am familiar with in Massachusetts. I do not think they would require an alteration of the mark itself, they would have to do with where it was placed, how large it could be.
>
> But there might be some which would also say you may not have anything that is over a store front. I think I am familiar with some of these where nothing may go over the store front except a flat sign which says, "real estate," or "hardware," et cetera, and they would have to display the trademark inside.
>
> I mean, if there was a uniform zoning requirement that said that, I would not want this to be preemptive.
>
> **Mossinghoff:** I do not believe it would be. Certainly, that would not be the intent. I think the whole key goes to requiring actual alteration of the mark itself. . . .
>
> **Frank:** There are some restricted commercial districts in particular areas that would say, "The only sign you may have must be in such and such lettering, and it must be this color."
>
> **Mossinghoff:** Right
>
> **Frank:** If that is uniform, I would think that anybody would have to abide by it. Nothing would stop the people here from displaying that inside. They could say, "real estate" outside; inside the protected registered trademark would be allowed.
>
> **Mossinghoff:** And it is more than just the advertising, I think it has to do with the name badges that people wear, the material that is mailed out, the business cards, all of those.

*Id.* at 39–18 to 39–19.

Finally, Jerry M. Patterson, author of the bill, summarized the precise reach of the amendment:

> The legislation . . . is narrowly written so that it merely reaffirms the intent of the act in that it expressly prohibits only State regulations that directly interfere with the use of a trademark or service mark as registered. The language does not interfere with nor question the validity of other State regulations that only indirectly affect the use of a trademark—for example, municipal ordinances that ban neon signs,

some of which may contain registered marks, from certain neighborhoods. The legislation is not intended to limit the right of States to regulate signs or agreements merely because they may involve registered trademarks. It will not prevent States from prohibiting deceptive or misleading advertising and unfair competition. On the contrary, the legislation will only prohibit State laws and regulations that attempt to alter ... federally-registered trademarks.

*Id.* at 39–21.

■ Therefore, in light of its legislative history, § 1121(b) was not designed to alter a municipality's ability to control the appearance of commercial developments within its borders. It is clear that the intent of § 1121(b) was not to interfere with uniform aesthetic zoning requirements that may indirectly affect a trademark, but was aimed only at prohibiting the actual alteration of a trademark.

### C. Case Law Interpretations

Although there appears to be a paucity of case law interpreting § 1121(b), at least two courts, in unpublished decisions, have addressed the precise situation I am confronted with in this action: *Motel 6 Operating L.P. v. City of South Lake Tahoe,* No. Civ–S–90–0527 (E.D.Cal. Oct. 25, 1990) and *Calpalbo v. Planning and Zoning Board of Appeals, Greenwich,* No. 23 20 60 (Conn.Super.Ct. July 17, 1987).

In *Motel 6 Operating L.P. v. City of South Lake Tahoe,* No. Civ–S–90–0527 (E.D.Cal. Oct. 25, 1990), plaintiff had operated a motel in the City of South Lake Tahoe since January 1976. During that time, it had displayed a sign bearing the distinctive design and colors of its registered trademark, which consisted of the word "Motel" set against a red six on a white clover.

In January 1987, South Lake Tahoe adopted a sign ordinance. Motel 6 applied to the city planning commission in 1989 for permission to install a new sign displaying its

trademark. The planning commission decided that it would allow Motel 6 to erect a new sign only if it changed the color of the clover from white to ivory and changed the color of the six to a more subdued hue of red.

Plaintiff commenced an action in federal court under the Lanham Act. In granting plaintiff's motion for summary judgment, the court held that "the City of South Lake Tahoe may not require Motel 6 to alter the colors of its federally registered mark on its sign at the South Lake Tahoe Motel 6 from those exhibited in the certificate of registration issued by the United States Patent Office." According to the court, this would violate 15 U.S.C. § 1121(b).

Although this case appears similar to the instant case, I decline to follow it. There is absolutely no discussion in the *Motel 6* decision of § 1121(b) or its extensive legislative history, which explicitly states that the statute was not intended to apply to aesthetic zoning regulations. Further, there is no indication in the decision of what the sign ordinance restrictions were that the City had adopted and whether they were applied in a uniform fashion.

I find that the more persuasive and correct reasoning is contained in *Calpalbo v. Planning and Zoning Board of Appeals,* No. 23 20 60 (Conn.Super.Ct. July 17, 1987). In that case, the plaintiff sought permission from the Town of Greenwich to erect a sign reflecting its five-colored service mark. The Town of Greenwich, however, had existing zoning regulations that limited the number of colors in any given sign to three. Plaintiff's application, therefore, was denied.

Plaintiff appealed to the Zoning Board of Appeals, arguing that the Town's limitation on the number of sign colors was impermissible, under 15 U.S.C. § 1121(a),[1] when the sign includes a federally registered service mark. The Zoning Board of Appeals denied the appeal, finding that § 1121(a) did not preempt the Town's zoning authority.

Plaintiff appealed to the Connecticut Superior Court. After a thorough analysis of

---

**1.** At the time of the *Calpalbo* decision, § 1121(a) contained the language that is currently codified in § 1121(b).

§ 1121(a)'s legislative history, the Court stated that "it is clear that the Greenwich ordinance is not in conflict with 15 U.S.C. § 1121(a).... [T]he ordinance does not require a change in the service mark. It merely says, by a uniform rule, that it may not be displayed if the number of colors exceeds three." [2]

### D. The Instant Case

Here, the plaintiff argues that the Penfield regulations do precisely what the statute forbids: require an alteration of a federally registered mark. I do not believe, however, that the regulations do any such thing.

The Town's regulations do not speak to trademarks at all. The regulations merely restrict the nature and type of outdoor advertising permitted in two large shopping plazas within the Town. There is no contention by plaintiff that, aside from the regulations' impact on its trademark, the regulations are otherwise unreasonable or improper.

The Town of Penfield is not attempting to alter plaintiff's mark; in fact, it is not even depriving the plaintiff of the use of its readily identifiable mark. Plaintiff, unlike Century 21, can use its trademark in its windows, on its bags, boxes, stationery, letterhead, indoor displays, etc. However, if it chooses to display an outdoor sign, it must comply, like all other stores in the plazas, with the Town's sign restrictions—restrictions that allow plaintiff and the other tenants to display the distinctive lettering of their marks, but merely regulate their color. Therefore, the Town has not altered plaintiff's trademark; it simply has imposed a uniform sign restriction. All other uses of plaintiff's trademark remain unimpaired. Stated simply, plaintiff has confused its sign with its trademark.

The fact that plaintiff would prefer to use its trademark as its sign should not preclude the Town from enforcing valid aesthetic zoning regulations. In essence, plaintiff has created the crisis by insisting that it has the absolute right to use its trademark as its outdoor sign regardless of the Town's uniform sign regulations.

If a proprietor's preference could defeat regulations such as this, virtually all aesthetic zoning would be ineffectual. If each commercial proprietor could insist that it be allowed to utilize its trademark as a storefront sign regardless of its size, shape or color, any type of aesthetic zoning would be rendered nugatory. It is clear that § 1121(b) was not intended to achieve this result.

### CONCLUSION

For the foregoing reasons, I find that Penfield's sign restrictions are not in conflict with § 1121(b) of the Lanham Act. Accordingly, defendants' motion for summary judgment is granted, and the complaint is dismissed. Plaintiff's cross-motion for summary judgment is denied.

IT IS SO ORDERED.

power the Town to regulate the color of signs. Therefore, the action of the Zoning Board of Appeals ultimately was reversed.

---

**2.** The court went on to hold, however, that although the ordinance did not violate the Lanham Act, Connecticut's General Statutes did not em-