141 F.3d 1295
 46 U.S.P.Q.2d 1437, 98 Cal. Daily Op. Serv. 2757,
98 Daily Journal D.A.R. 3811
 BLOCKBUSTER VIDEOS, INC., a Texas corporation; Video
Update, Inc., a Minnesota corporation, Plaintiffs-Appellees,
v.
CITY OF TEMPE, a municipal subdivision of the State of
Arizona, Defendant-Appellant.
 No. 97-15535.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 16, 1997.
Decided April 15, 1998.
 
 Clifford L. Mattice and David Merkel, Office of the City Attorney, Tempe, AZ, for defendant-appellant.
 David K. Jones, Phoenix, Arizona, and Marcia B. Paul, New York City, for plaintiffs-appellees.
 Jeffrey L. Aran, Aran & Meyer, Sacramento, CA, Robert M. Aran, Robert M. Aran, P.C., Encino, CA, amicus counsel for the Sign Users Council of California and the Business Identity Council of America.
 David C. Weiner, Michael J. Garvin, Steven A. Goldfarb, Margaret S. Russell, Hahn Loeser & Parks, LLP, Cleveland, OH, for Amici Curiae The International Franchise Association, Ramada Franchise Systems, Inc., Howard Johnson International, Inc., Super 8 Motels, Inc., Days Inns of America, Inc, Century 21 Real Estate Corporation, ERA Franchise Systems, Inc., Coldwell Banker Real Estate Corporation and Avis, Inc.
 Appeal from the United States District Court for the District of Arizona; Roger G. Strand, District Judge, Presiding. D.C. Nos. CV 96-02815-RGS CV 96-02814-RGS
 Before: BROWNING, CHOY and THOMPSON, Circuit Judges.
 Opinion by Judge THOMPSON; Partial Concurrence and Partial Dissent by Judge BROWNING.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 We consider a question of first impression: whether section 1121(b) of the Lanham Act, 15 U.S.C. § 1121(b) (1994), preempts a municipality's zoning authority to regulate signs for aesthetic purposes when those signs display registered service marks. We hold that a municipality may not enforce zoning regulations if those regulations require the alteration of a registered mark.
 
 
 2
 Blockbuster Videos, Inc. ("Blockbuster") and Video Update, Inc. applied to the City of Tempe for sign permits for storefront signs which would incorporate their registered service marks. Because the proposed signs violated Tempe's zoning ordinances, Tempe denied the applications. The district court granted a preliminary injunction, ordering Tempe to allow both stores to display their registered marks. Tempe appeals. We have jurisdiction under 28 U.S.C. § 1292(a)(1), and we affirm in part and reverse in part.
 
 FACTS
 
 3
 Blockbuster and Video Update are national retail chains, which rent and sell videos and other related entertainment. Both have registered service marks. Video Update's registered service mark consists of the words "Video Update" in stylized red[1] lettering which is wider at the bottom and narrower at the top. Blockbuster has two registered service marks. One is a torn ticket with a blue background and yellow lettering. The other is a blue awning with the words "Blockbuster Video" in yellow block letters.
 
 
 4
 In 1996, Video Update and Blockbuster leased space in two separate shopping centers in Tempe, Arizona. In Tempe, all exterior signs in a shopping center must conform to the center's sign package, which specifies such things as the color, size and location of signs. The owner of a shopping center creates the sign package, subject to review and approval by the Tempe Design Review Board (the "Board"). Individual tenants may apply to the Board for variances from the sign package.
 
 
 5
 The sign package for the shopping center in which Video Update had leased space required white letters on a turquoise background. Video Update applied to use red letters on two storefront signs. The Board allowed red letters on the sign facing the street but required white letters for the sign inside the shopping center.
 
 
 6
 The sign package for the shopping center in which Blockbuster had leased space required blue, red or yellow letters. Blockbuster applied to use its torn ticket logo service mark on the exterior signs and to construct its blue awning service mark. The Board approved the torn ticket signs, but did not approve installation of the awning. In place of the awning, the Board approved a sign with blue letters.
 
 
 7
 After Blockbuster and Video Update each unsuccessfully appealed the Board's decision to the Tempe City Council, they each sued the City of Tempe. The district court consolidated the two cases and granted a preliminary injunction, requiring Tempe to allow Blockbuster and Video Update to display their registered service marks as they had requested. This appeal followed.
 
 DISCUSSION
 
 8
 This appeal is from the district court's order granting a preliminary injunction. The record, however, is fully developed, the plaintiff requests both preliminary and permanent relief, and the district court's decision rests primarily on an interpretation of law. In these circumstances, we may decide the merits of the entire case, Beno v. Shalala, 30 F.3d 1057, 1063 (9th Cir.1994) (citing Sierra Club v. Marsh, 816 F.2d 1376, 1382 (9th Cir.1987)), and we do so.
 
 A. Section 1121(b) of the Lanham Act
 
 9
 Tempe contends that 15 U.S.C. § 1121(b) does not preclude a municipality from enforcing a zoning ordinance, which specifies the color, size and general architectural features of storefront signs, even if the signs incorporate a registered service mark. This is an issue of first impression in this circuit.
 
 
 10
 As in all questions of statutory interpretation, we begin with the language of the statute itself and "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985). Section 1121(b) of the Lanham Act reads as follows:
 
 
 11
 No state or other jurisdiction of the United States or any political subdivision or any agency thereof may require alteration of a registered mark, or require that additional trademarks, service marks, trade names, or corporate names that may be associated with or incorporated into the registered mark be displayed in the mark in a manner differing from the display of such additional trademarks, service marks, trade names or corporate names contemplated by the registered mark as exhibited in the certificate of registration issued by the United States Patent and Trademark Office.
 
 
 12
 15 U.S.C. § 1121(b) (1994).
 
 
 13
 The part of section 1121(b) relevant to our inquiry is the first clause, which states: "No state ... or any political subdivision or agency thereof may require alteration of a registered mark...." To alter means "to cause to become different in some particular characteristic (as measure, dimension ... ) without changing into something else; to change or modify." Webster's Third New International Dictionary 63 (1986).
 
 
 14
 The color red is a characteristic of Video Update's mark. By requiring Video Update to change the red color of the lettering on one of its signs to white letters on a turquoise background, Tempe required Video Update to "alter" its service mark. This alteration violates section 1121(b) of the Lanham Act.
 
 
 15
 Section 1121(b), however, does not require municipalities to allow businesses to display their registered marks. A municipality retains the power to prohibit the use of a registered mark altogether. This is so because section 1121(b) speaks only to the alteration of a mark. Thus, Tempe could prevent Blockbuster from installing its awning service mark on the outside of the building it leased in the shopping center.
 
 
 16
 Tempe contends that in the exercise of its police power to ensure compliance with aesthetic zoning, it should be able to require the alteration of registered marks. Because requiring all signs in a given shopping center to have, for example, white letters on a turquoise background would give a uniform, aesthetically pleasing look to the shopping center, Tempe contends section 1121(b) should not prevent it from promulgating zoning regulations to achieve this aesthetic goal, even if its regulations alter a mark.
 
 
 17
 Although this argument has some appeal, we must reject it. The language of section 1121(b) is clear. "No state ... or any political subdivision or agency thereof may require alteration of a registered mark...." 15 U.S.C. § 1121(b).
 
 
 18
 When the words of a statute are clear, our inquiry is at an end. Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149-50, 117 L.Ed.2d 391 (1992); United States v. Morales, 108 F.3d 1031, 1036 (9th Cir.1997). Thus, we need not look to the legislative history on which Tempe relies.
 
 
 19
 Nevertheless, if we were to look at the legislative history of section 1121(b), we would conclude the legislative history is not "demonstrably at odds with the intent of the drafters." United States v. Ron Pair Enters., 489 U.S. 235, 242, 109 S.Ct. 1026, 1030-31, 103 L.Ed.2d 290 (1989). One of the purposes of the Lanham Act is "to protect registered marks ... from interference by State, or territorial legislation...." 15 U.S.C. § 1127 (1994). Congress's intent in enacting section 1121(b) conforms to that purpose in that the section was enacted to stop states from interfering with franchisors' trademarks. H.R. Rep No. 97-778, at 1 (1982), U.S. Code Cong. & Admin. News at 2621.
 
 
 20
 The protagonist in the story of the enactment of section 1121(b) is Century 21, a national franchisor of real estate brokerage firms. Century 21 had a registered service mark which consisted of Century 21's logo, covering 80% of the mark, and the name of the local franchisee, covering the remaining 20% of the mark. To protect the public from being misled about the nature of the franchisor-franchisee relationship, the Nevada Real Estate Advisory Commission issued a regulation which required any Century 21 franchisee's name to be as large as the Century 21 logo. Century 21 Real Estate Corp. v. Nevada Real Estate Advisory Comm'n, 448 F.Supp. 1237, 1239 (D.Nev.1978), aff'd, 440 U.S. 941, 99 S.Ct. 1415, 59 L.Ed.2d 630 (1979). Century 21 objected to the regulation and filed suit in the Nevada District Court, claiming Nevada's regulation violated Century 21's service mark rights under the Lanham Act. The district court ruled in favor of the Nevada Commission and held that the regulation did not violate the Lanham Act. Id. at 1241.
 
 
 21
 After the Century 21 decision, other states adopted rules requiring different percentages of a mark to be devoted to the franchisee's name. H.R. Rep No. 97-778, at 1. In response, a district court in New York held that such regulation "inhibited nationwide advertising campaigns, increased costs, and made the franchisor-franchisee relationship less appealing." Payless Shoesource, Inc. v. Town of Penfield, New York, 934 F.Supp. 540, 543 (W.D.N.Y.1996). Against this backdrop, Congress enacted section 1121(b).
 
 
 22
 The second clause of section 1121(b) directly responds to the Century 21 problem. This clause prohibits any state from requiring the owner of a registered mark to display additional trademarks in the registered mark "in a manner differing from the display of such additional trademarks ... contemplated by the registered mark."
 
 
 23
 Section 1121(b), however, also has a first clause. The first clause, which prohibits altering a mark, was not necessary to address the Century 21 problem because that problem was addressed by the second clause. It seems apparent, therefore, that Congress added the first clause to cover situations in which a state, local political subdivision, or agency might require other types of changes in a registered mark, changes such as those we see here.
 
 
 24
 Tempe is correct in noting that Congress attempted to limit the extent to which section 1121(b) impinges upon a state's zoning power. Congress limited section 1121(b) to prohibiting any alteration of the mark itself. H.R.Rep. No. 97-778, at 2. Thus, a state, political subdivision or agency remains free to regulate where and whether signs may be placed and how large they may be.[2] See Lanham Trademark Act Amendment: Hearings on H.R. 5154 before the Subcomm. on Courts, Civil Liberties, and the Admin. of Justice of the House Comm. on the Judiciary, 97th Cong. 5 (1982) (hereinafter Hearings ) (statement of Gerald J. Mossinghoff, Commissioner of Patents and Trademarks). In this way, the Committee on the Judiciary believed that section 1121(b) did not restrict zoning laws. H.R.Rep. No. 97-778, at 2.
 
 
 25
 However, when Congress wants to make its intentions clear, it does so in the language of the statute. For example, Congress amended the Copyright Act to insure that the Act would not affect states' zoning powers.[3] 17 U.S.C. § 301(b)(4) (1994). Had Congress intended similarly to exempt states' zoning powers in 15 U.S.C. § 1121(b), it would have written the same kind of specific exception into that section. It did not.
 
 
 26
 In support of its zoning exception argument, Tempe relies on a discussion which took place during the hearings conducted by the House Subcommittee reviewing section 1121(b). Hearings, supra, at 10-11. Mr. Frank, a congressman from Massachusetts, expressed concern that this statute not "override otherwise uniform aesthetic or historic zoning." Id. at 10. In discussing his concern that historic places, such as Colonial Williamsburg, Virginia, be allowed to regulate the appearance of signs, Mr. Frank asked whether section 1121(b) would prohibit regulations that might specify the color and type of lettering on a sign. Id. at 11. He then answered his own question by stating that such regulations might simply prevent a business from displaying its trademark on the outside of the building: "They could say, 'real estate' outside; inside the protected registered trademark would be allowed." Id. These statements indicate an acknowledgment that zoning regulations may prohibit the display of trademarks on storefront signs, without violating section 1121(b). They do not suggest zoning regulations may require the alteration of a mark.
 
 
 27
 Moreover, it is unlikely that Congress intended the broad zoning exception Tempe seeks. Such an exception would defeat the purpose of the Lanham Act: to protect the goodwill created by using a uniform mark and to protect the ability of consumers to distinguish among competing producers. Park 'N Fly, Inc., 469 U.S. at 198, 105 S.Ct. at 663-64 (citing S.Rep. No. 79-1333, at 3, 5 (1946)).
 
 
 28
 A trademark is a symbol, which carries customer recognition and goodwill:
 
 
 29
 The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them.... The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same--to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value.
 
 
 30
 Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942).
 
 
 31
 In order for a trademark to be a symbol that customers will recognize, it must have a uniform appearance, not only in design, but also in color. The Supreme Court has recognized that color is so important to customer recognition that, in some instances, the color itself can be registered as a trademark because customers identify a particular brand by its color. Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 162-64, 115 S.Ct. 1300, 1303, 131 L.Ed.2d 248 (1995). For example, customers recognize a particular brand of insulation by its pink color. In re Owens-Corning Fiberglas Corp., 774 F.2d 1116, 1127 (Fed.Cir.1985).
 
 
 32
 If Video Update and Blockbuster are required to change their service marks to a turquoise and white sign in one shopping center and a pink and white sign in another, then there would be no uniform mark for customers to identify. Further, customers who were to see a store with a pink and white sign instead of the nationally recognized blue and yellow Blockbuster service mark might think that the store was not a real Blockbuster store. Therefore, allowing a municipality to regulate storefront signs in the way Tempe seeks to regulate the appellees' signs in this case would allow the municipality to require a change in the appellees' registered service marks. This would conflict with the plain language of 15 U.S.C. § 1121(b) and the purpose of the Lanham Act.
 
 
 33
 We hold that a zoning ordinance may not require a change in a registered mark. A zoning ordinance may, however, preclude the display of a mark, as Tempe did when it precluded Blockbuster from constructing its awning on the exterior of its leased building in the shopping center. Precluding display of a mark for zoning purposes is permissible; requiring alteration of a mark is not.
 
 B. Attorney Fees
 
 34
 Blockbuster and Video Update request attorney fees on appeal under both the Lanham Act and Arizona law. Under the Lanham Act, a court may award attorney fees in exceptional cases. 15 U.S.C. § 1117(a). "While the term 'exceptional' is not defined in the statute, generally a trademark case is exceptional for the purposes of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful." Intel Corp. v. Terabyte Int'l, Inc., 6 F.3d 614, 621 (9th Cir.1993) (citations omitted). Infringement is not willful if the defendant "might have reasonably thought that its proposed usage was not barred by the statute." International Olympic Comm. v. San Francisco Arts & Athletics, 781 F.2d 733, 738-39 (9th Cir.1986), amended by 789 F.2d 1319 (9th Cir.1986), aff'd sub nom San Francisco Arts & Athletics v. Inter-National Olympic Comm., 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987).
 
 
 35
 While this case is not one of infringement, the same principle applies. Tempe could have reasonably thought that its zoning ordinances did not violate section 1121(b), especially because this is a question of first impression. We decline to award attorney fees under the Lanham Act.
 
 
 36
 For the same reason, we decline to award attorney fees under Arizona statutes § 12-341.01(C)[4] and § 12-349(A),[5] which allow attorney fees when a party has brought a claim which constitutes harassment, is groundless and is not made in good faith.
 
 CONCLUSION
 
 37
 We conclude that the plain meaning of 15 U.S.C. § 1121(b) (1994) prohibits a municipality from enforcing a zoning ordinance which requires the alteration of a registered mark. A municipality may, however, prohibit the display of a registered mark. We affirm the district court's order insofar as it enjoins the City of Tempe from requiring Video Update to alter its service mark by changing the color of the mark's red lettering. We reverse the district court's order insofar as it enjoins Tempe from precluding Blockbuster from erecting its awning service mark. We decline to grant attorney fees for this appeal. We remand to the district court for entry of a final judgment consistent with this opinion.
 
 
 38
 Each party shall bear its own costs for this appeal.
 
 
 39
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 40
 BROWNING, Circuit Judge, concurring in part and dissenting in part.
 
 
 41
 I concur in the majority's opinion insofar as it affirms Tempe's authority to condition the approval of a permit to display exterior signage in the Albertsons Plaza Shopping Center on conformance with that shopping center's sign package, which stipulates that exterior signs in the shopping center will be flat. I dissent, however, from the majority's holding that Tempe cannot condition the display of exterior signage at the Valley Fair Shopping Center on conformity with the requirement that such signage employ white letters against a turquoise background and I disagree with the underlying interpretation of Section 1121(b) that led the majority to this result.
 
 
 42
 Section 1121(b) prohibits states and localities from applying regulations to federally registered trademarks that require changes in the marks themselves, alterations that will be reflected in every subsequent use of the affected marks. Section 1121(b) does not preempt local aesthetic zoning controls that affect the display of federal trademarks in exterior signage at particular locations. Tempe is not, for example, preempted under Section 1121(b) from enacting and enforcing zoning regulations restricting the use of color in exterior signage in a particular shopping center, even though businesses holding trademarks with incompatible colors will be precluded from displaying their marks in exterior signage at that shopping center. I dissent from the majority opinion's rejection of this interpretation of Section 1121(b), and from the unsupportable distinction the majority draws between local aesthetic regulation of color, on the one hand, and architectural features on the other in the context of exterior signage.
 
 
 43
 * "Alter" as used in Section 1121(b) does not encompass local ordinances limiting the permissible size, color, construction, or other physical characteristics of exterior signage, even if a trademark holder wishes to use its trademark in such signage. The term refers to state-mandated changes to federal marks themselves, changes that will, of necessity, be reflected in every subsequent use of the affected marks within that jurisdiction.
 
 
 44
 Congress enacted Section 1121(b) in response to the Century 21 experience, to make clear that some kinds of state regulation of trademarks are preempted by the Lanham Act. In Century 21, the Nevada Real Estate Advisory Commission required the alteration of real estate trademarks, as such, by physically incorporating the broker's name in such trademarks whenever displayed in Nevada, including on "signs, letterheads, business cards, brochures, uniforms, name tags, folders, checks, forms, memo pads, desk plates, display materials, marketing materials, advertisements, etc." Payless Shoesource, Inc. v. Town of Penfield, New York, 934 F.Supp. 540, 543 (W.D.N.Y.1996).[1] In the name of consumer protection, the Commission implemented its own regulatory scheme governing the content of real estate trademarks.
 
 
 45
 This is the sort of "alteration" Congress sought to prohibit with the enactment of Section 1121(b). In contrast, local aesthetic zoning regulations affect only specific, isolated applications of federally registered trademarks (e.g., use in exterior signs at a particular location) and do not alter the trademarks themselves in a manner that is reflected whenever they are used. Tempe's sign ordinances, for example, limit the permissible aesthetic characteristics (color, size, materials, architectural features, etc.) of exterior signage in particular shopping centers, but do not affect the marks themselves or any other application of the marks within the city. The regulations are not directed at the marks at all, but at aesthetic considerations affecting the shopping centers and the public.
 
 
 46
 Tempe neither required the plaintiffs to incorporate their trademarks into their exterior signage nor mandated that they lease space in the particular shopping centers. It was the plaintiffs that elected to lease space in shopping centers where, from the terms of the particular shopping centers' sign packages, they knew they would be prohibited from displaying their marks as registered. When, predictably, the City denied their applications to display the trademarks on exterior signs in those shopping centers, plaintiffs chose to sue the City rather than employ exterior signs consistent with the City's sign ordinance or confine the display of their trademarks to interior signs. Under these circumstances, realistically, it cannot be said that Tempe's sign ordinances required any alteration of the plaintiffs' registered marks in violation of Section 1121(b). As Chief Judge Larimer noted in a similar case,
 
 
 47
 The fact that plaintiff would prefer to use its trademark as its sign should not preclude the Town from enforcing valid aesthetic zoning regulations. In essence, plaintiff has created the crisis by insisting that it has the absolute right to use its trademark as its outdoor sign regardless of the Town's uniform sign regulations.
 
 
 48
 Payless, 934 F.Supp. at 546.
 
 
 49
 As the majority opinion correctly notes, Tempe's sign packages were adopted pursuant to the City's aesthetic zoning authority and specify the size, construction, color, architectural features, and other characteristics that may be employed in exterior signage by tenants in each of the City's various shopping centers.[2] Shopping center tenants are free to display any text--including registered marks--so long as the color, size, construction, character, and location of the signs comply with the sign package for that shopping center. In the case of Blockbuster Videos, the sign package applicable in the Albertsons Plaza Shopping Center requires that all exterior signs be flat,[3] effectively preventing Blockbuster Videos from displaying its awning mark in exterior signs. In the case of Video Update, the Valley Fair Shopping Center sign package requires that all exterior signs consist of white letters against a turquoise background, effectively precluding Video Update from displaying its registered red stylized lettering mark in exterior signs.
 
 
 50
 The majority opinion correctly holds that Tempe can, consistent with Section 1121(b), deny Blockbuster Videos permission to display its awning mark as an exterior sign. The appropriate principle underlying this holding is not, however, that the relevant aesthetic restriction survives only because it constitutes a "prohibition" on the display of Blockbuster Videos' trademark rather than an "alteration" of it, but instead that Section 1121(b) does not bar states and their subdivisions from adopting aesthetic zoning regulations, even if those regulations indirectly affect the use of a federally registered trademark in exterior signs. Under this reasoning, both the color and the architectural feature regulations at issue in this case should be upheld. Tempe sought to control the use of color for the same reason it barred the use of protruding architectural features such as awnings: to protect and enhance the appearance of its commercial areas by promoting a certain level of aesthetic consistency. The City denied Video Update's application to display a red sign and Blockbuster Videos' application to erect an awning because both were aesthetically inconsistent with the City's sign controls. Both were elements of registered trademarks--both were barred--neither trademark was altered.
 
 
 51
 The majority attempts to distinguish Tempe's color controls from its regulation of architectural features on the ground that the City prohibited Blockbuster Videos from using an awning in its exterior signage and required Video Update to use white letters on a turquoise background in its signage. But this distinction is pure semantics. It could just as easily be said that Tempe required that Blockbuster display a flat sign and prohibited Video Update from using colors other than white. There is no reasoned basis for drawing a distinction for purposes of Section 1121(b) preemption between local regulation of color and of architectural features. Color and architectural features are analogous aesthetic components of registered trademarks. If Congress intended to leave localities free to prohibit the use of architectural features, surely localities can also control the use of color.
 
 II
 
 52
 The majority seriously misconstrues the language and legislative history of Section 1121(b), as well as the relevance of the Copyright Act. The majority acknowledges that Section 1121(b) was enacted in response to Century 21, but inexplicably concludes that only the second clause of Section 1121(b) was intended to respond to the Century 21 problem. There is no support for this distinction in the language or legislative history. To the contrary, the House Report on the bill that became Section 1121(b) states that the bill arose out of the Century 21 experience and draws no distinction between its two provisions. H.R.Rep. No. 97-778 at 1-2 (1982). The more natural interpretation is that together, the two clauses were designed to prevent alterations to registered marks of the kind required by the Nevada Real Estate Advisory Commission.
 
 
 53
 The majority asserts the legislative history of Section 1121(b) indicates Congress intended to permit localities only to either prohibit exterior signs containing registered trademarks or regulate their size and location. This is a serious mischaracterization of the legislative history, which leaves no doubt that Congress did not intend Section 1121(b) to limit the power of local governments to enact and enforce aesthetic zoning regulations at all, even if those regulations applied to federally registered trademarks.
 
 
 54
 Neither Congressman Frank nor anyone else testifying before the House Subcommittee adopted the interpretation of Section 1121(b) suggested by the majority. Mr. Frank was concerned that the amendment might be interpreted as limiting the power of localities to impose uniform aesthetic and historic zoning regulations like those adopted by Tempe. See Lanham Act Trademark Act Amendment, Hearing on H.R. 5154 before the Subcommm. on Courts, Civil Liberties, and the Administration of Justice, 97th Cong. at 9-11 (1982). Mr. Frank explicitly raised the issue of local ordinances restricting the permissible color, lettering, construction, and content of exterior signage, and was repeatedly assured that such regulations would continue to be valid under Section 1121(b). Id. at 10-11. The House Report states:
 
 
 55
 To make the limited scope of the bill clear the Committee adopted an amendment, recommended by the Patent and Trademark Office, to make it clear that restriction on state's power is limited to the display of other franchisee's name "in the mark" itself and not to the uses of trademarks in advertizing. During the course of Committee debate Mr. Frank raised the issue of whether the bill would in any way restrict the zoning or historic site protection laws or regulations of states. On the advice of counsel, the Committee concludes that the bill in no way affects the powers of state and local governments in areas of concern raised by [Mr. Frank].
 
 
 56
 H.R.Rep. No. 97-778 at 2 (1982), U.S. Code Cong. & Admin. News at 2622 (emphasis added).
 
 
 57
 Those who testified before the House Subcommittee uniformly agreed that under Section 1121(b), state and local governments would continue to be free to enforce aesthetic zoning restrictions applicable to signage, even if that regulation affected the display of registered trademarks. In his prepared testimony, Hon. Jerry M. Patterson, author of the bill that would become Section 1121(b) stated, "[t]he legislation is not intended to limit the right of States to regulate signs or agreements merely because they may involve registered trademarks ... [o]n the contrary, the legislation will only prohibit State laws and regulations that attempt to alter a federally-registered trademarks [sic]." Lanham Act Trademark Act Amendment, Hearing on H.R. 5154 before the Subcommm. on Courts, Civil Liberties, and the Administration of Justice, 97th Cong. at 13 (1982).
 
 
 58
 Thus, the author of the bill clearly distinguished regulation of signs that make use of a federally registered trademark from regulation that alters the mark itself. The term "alteration" was used by the bill's author to describe state-mandated changes in the mark itself, which are, of necessity, reflected in every subsequent display of that mark within the relevant jurisdiction. Regulation that directly alters the mark itself is quite different from regulation that defines permissible aesthetic characteristics for signage in specific shopping centers and affects registered trademarks only indirectly.
 
 
 59
 Mr. Patterson also noted that the bill was "narrowly written so that it merely reaffirms the intent of the act in that it expressly prohibits only State regulations that directly interfere with the use of a trademark or service mark as registered. The language does not interfere with nor question the validity of other State regulations that only indirectly affect the use of a trademark--for example, municipal ordinances that ban neon signs, some of which may contain registered marks, from certain neighborhoods." Id. at 13. Mr. Patterson anticipated sign controls like Tempe's and acknowledged that local prohibition of signs with specific aesthetic characteristics (such as the use of neon lighting, or, in Tempe's case, the use of other than specified colors) was consistent with Section 1121(b).
 
 
 60
 Hon. Gerald J. Mossinghoff, the Commissioner of Patents and Trademarks testified that he agreed with Mr. Frank that, "nothing in [the bill] would be meant to interfere with local aesthetic or hist[o]ric-type zoning, so that if there was a uniform requirement in a particular locality ... which required that any sign had to conform to a certain type, that nothing in [the bill] would be preemptive of that." Id. at 10. Mr. Mossinghoff also acknowledged that Section 1121(b) would not impair a locality's ability to announce to businesses, "[t]he only sign you may have must be in such and such lettering, and must be this color." Id. at 10-11.
 
 
 61
 Iris D. Reeves, who testified as the representative of Century 21 franchisees, acknowledged that the bill was "not intended to limit the right of States to regulate signs or agreements merely because they may involve registered trademarks." Id. at 14. John P. Moravek, who represented Century 21 in its roles as franchisor and sponsor of the bill, agreed that the bill was not intended to interfere in any way with local zoning authority. See Id. at 41.
 
 
 62
 The comments during the Senate hearing on Section 1121(b) were consistent with those in the House. Senator Hatch noted:
 
 
 63
 Many states and local communities have laws or ordinances designed to promote scenic beauty, historical preservation and environmental protection. The legislation was carefully drafted so as to avoid any conflict with the traditional state right to regulate such matters.
 
 
 64
 and
 
 
 65
 Nothing in this bill is intended to preclude the states from adopting legislation to promote the health, welfare and safety of citizens. For example, nothing in this bill prevents the states from enacting legislation to promote scenic beauty, historical preservation or environmental protection.
 
 
 66
 Cong. Rec. S-12636 (1982).
 
 
 67
 As the foregoing discussion makes clear, the legislative history of Section 1121(b) provides unmistakable evidence that Congress intended that local governments would retain their traditional authority to regulate signage through zoning; trademark holders are not empowered by Section 1121(b) to ignore and frustrate local zoning controls.
 
 
 68
 The majority opinion argues that if Congress had intended to exempt local zoning power from federal preemption under Section 1121(b), it would have done so explicitly, as it did in the context of copyright law. Congress enacted Section 301(b)(4) of the Copyright Act to bring about "a fundamental and significant change" in existing copyright law by creating a new uniform federal copyright system and preempting and abolishing "rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law." Notes of Committee on the Judiciary, H.R.Rep. No. 94-1476 (1976). Congress carved out an exception to the general regime of uniform and exclusive federal copyright control by identifying "areas of protection that preemption would not prevent the States from protecting," including rights or remedies relating to "zoning". Id.
 
 
 69
 Section 301(b)(4) allows states and localities to afford additional protection to copyrights through zoning. An analogous exception to Section 1121(b) would provide that states could limit trademark rights through zoning. Because the inclusion of an exemption for local zoning authority in Section 1121(b) would serve a purpose entirely different from the zoning exemption included in Section 301(b)(4), the majority was wrong to draw an inference regarding the absence of an exemption in the Lanham Act from the presence of an exemption in the Copyright Act.
 
 III
 
 70
 The majority's misinterpretation of Section 1121(b) would seriously erode local power to enact and apply aesthetic zoning regulations when they indirectly affect federal trademarks. The majority opinion adopts an extreme interpretation of the Lanham Act that will give trademark holders the absolute right to display their marks, free of regulation, no matter how garish and inappropriate they may be in a particular public environment, and notwithstanding the carefully considered local aesthetic controls applicable to that environment.
 
 
 71
 The majority opinion transforms what Congress intended to be a narrow, technical clarification of the preemptive effect of the Lanham Act[4] into a broad-ranging and unintended prohibition of local aesthetic controls. The adverse impact on state and local efforts to promote and protect aesthetic standards will be substantial. Contrary to the clear intent of Congress, the power to control the appearance of exterior signage will shift from local governments and local landlords to national franchisors with strikingly different interests. As Judge Larimer explained in Payless, "[i]f a proprietor's preference could defeat regulations such as this, virtually all aesthetic zoning would be ineffectual. If each commercial proprietor could insist that it be allowed to utilize its trademark as a storefront sign regardless of its size, shape or color, any type of aesthetic zoning would be rendered nugatory." Payless, 934 F.Supp. at 546.
 
 
 72
 Local aesthetic zoning ordinances strike a balance between the interest of local businesses in attracting the attention of consumers by standing out from other businesses and the background environment, and the desire of members of the local community to pursue and maintain aesthetic standards. In adopting Section 1121(b), Congress recognized the vital role played by local zoning controls and sought to balance the need for such regulations against the importance of protecting consumers and trademark holders. Both interests are reflected in the language and legislative history of Section 1121(b), and should be considered in interpreting and applying the statute. The ultimate balance struck by Congress was to prohibit state and local governments from actually requiring the alteration of registered marks themselves, while preserving local government power to restrict or prohibit particular applications of registered marks. The majority opinion would seriously disturb that balance.
 
 
 
 [1]
 When this action commenced, Video Update's service mark did not specify a color. However, Video Update had applied to the United States Patent and Trademark Office to amend its registration to include the color red. That amendment has been approved. We base our decision on the fact that Video Update's registered mark now consists of red lettering
 
 
 [2]
 The dissent contends that we adopt "an extreme interpretation of the Lanham Act that will give trademark holders the absolute right to display their marks, free of regulation, no matter how garish and inappropriate they may be...." Dissent at pages 3466-67. This simply is not so. First of all, our interpretation is not "extreme." It is what the plain language of the statute says. Second, a City retains great leeway in requiring conformity with its aesthetic zoning controls. It can deny any display of the mark. It can require that the mark be reduced in size, and it can dictate where the mark may be placed. What it cannot do, however, is require alteration of the mark itself
 
 
 [3]
 Section 301(b) states: "Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to--(4) State and local landmarks, historic preservation, zoning...." 17 U.S.C. § 301(b)
 
 
 [4]
 A.R.S. § 12-341.01(C) provides:
 Reasonable attorney's fees shall be awarded by the court in any contested action upon clear and convincing evidence that the claim or defense constitutes harassment, is groundless and not made in good faith.
 
 
 [5]
 A.R.S. § 12-349 provides:
 A. [T]he court shall assess reasonable attorney's fees ... if the attorney or party does any of the following:
 
 
 [1]
 Brings or defends a claim without substantial justification
 
 
 [2]
 Brings or defends a claim solely or primarily for delay or harassment
 ...
 F. In this section, "without substantial justification" means that the claim or defense constitutes harassment, is groundless and is not made in good faith.
 
 
 [1]
 Section VII of the Rules and Regulations of the Nevada Real Estate Advisory Commission provides as follows:
 "(4) Any broker who operates under or uses a franchise name shall:
 (b) incorporate in the franchise name and logotype his own name; however, the broker's name may not be less than 50 percent of the surface area of the entire combined area of both the broker's name and the trade name or logotype ..."
 
 
 [2]
 Aesthetic regulations applicable to exterior signage, like other local ordinances affecting public health, safety, and morals, are a valid exercise of the police power. See City of Ladue v. Gilleo, 512 U.S. 43, 48-49, 114 S.Ct. 2038, 2041-42, 129 L.Ed.2d 36 (1994); City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 806-07, 104 S.Ct. 2118, 2129-30, 80 L.Ed.2d 772 (1984); Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507-08 & 510-12, 101 S.Ct. 2882, 2892-93, 2893-95, 69 L.Ed.2d 800 (1981); Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 102-03, 99 L.Ed. 27 (1954)
 
 
 [3]
 The sign package requires that all exterior wall signs consist of individual pan channel 22 gauge metal letters with acrylic sheet (or equal) that are internally illuminated with neon
 
 
 [4]
 In describing the impetus for the Lanham Act amendment, the House Report states:
 The purpose of [the bill that would become Section 1121(b) ] is to eliminate this confusion and to restore the preemptive nature of federal Trademark law. It in no way restricts the rights of states to otherwise regulate the activities of franchise realtors.
 H.R.Rep. No. 97-778 at 2 (1982). The bill's author, Mr. Patterson, testified at the hearing that the bill was "narrowly written so that it merely reaffirms the intent of the act in that it expressly prohibits only State regulations that directly interfere with the use of a trademark or service mark as registered. The language does not interfere with nor question the validity of other State regulations that only indirectly affect the use of a trademark--for example, municipal ordinances that ban neon signs, some of which may contain registered marks, from certain neighborhoods." Lanham Act Trademark Act Amendment, Hearing on H.R. 5154 before the Subcommm. on Courts, Civil Liberties, and the Administration of Justice, 97th Cong. at 13 (1982).