11-5199
REX V. MARTINEZ

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

New York's Commissioner of Motor Vehicles, citing his sole control over the issuance of custom license plates in the State of New York, deems a proposed custom plate depicting a sun and two smiling children, and bearing the words, "Choose Life," to be "patently offensive," and thus prohibited under New York law. In its desire to uphold this surprising result, the majority downplays the broad discretion afforded to the Commissioner, perceives content in a regulation without it, and divines a long-standing practice from trivial and contradictory evidence. The majority effectively shields New York's custom plate program from judicial review and does so in a manner out of line with our precedent and with similar cases from around the country. Because I would find that New York State's custom plate program places no meaningful limit on the Commissioner's discretion, thereby inviting viewpoint discrimination, I respectfully dissent.

**I.**

Since 1977, New York has empowered its Commissioner of Motor Vehicles to issue "special number plates" in accordance with Department of Motor Vehicle regulations. *See* N.Y. VEH. & TRAF. LAW § 404 ("section 404"). Section 404 lodges the

decision to issue such plates solely with the Commissioner, providing that "[n]othing contained in [the statute] shall be construed to require the [C]ommissioner to issue a special number plate or plates." *Id.* 404(4); *see also id.* 404(1) ("The [C]ommissioner *may* issue special number plates . . . ." (emphasis added)). Beyond minimal fee requirements, the Commissioner's discretion in issuing the plates is impacted by only one regulation, 15 N.Y.C.R.R. § 16.5, which states in relevant part that "[n]o plate shall be issued . . . which . . . is, in the discretion of the [C]ommissioner, obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive." *Id.* §16.5(e).[1] The interpretation of these terms, as noted in the regulation, is entrusted to "the discretion of the [C]ommissioner." *Id.* Thus, by their plain terms, section 404 places no limit on the Commissioner's discretion in reviewing applications for special number plates, and 15 N.Y.C.R.R. § 16.5 places at most a modest one, requiring the

[1] 15 N.Y.C.R.R. § 16.5 states in full that:

> No plate shall be issued under this Part which: (a) does not have at least one letter. This provision shall not apply to plates issued to public officers; (b) has numbers and letters, or any combination thereof, arranged in a format reserved for issuance to specific classes of vehicles other than passenger vehicles; (c) is assigned for issuance to historical motor vehicles; (d) consists of six numbers followed by one letter; (e) is, in the discretion of the commissioner, obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive; or (f) would lead one to believe that the owner of a particular vehicle is connected with or operating in an official capacity for a governmental organization or function.

2

Commissioner to deny applications that he determines run afoul of the regulation. The Commissioner's discretion to approve applications is unlimited beyond the scope of 15 N.Y.C.R.R. § 16.5, and his discretion to deny applications is entirely unbounded.

In 1992, in a bid to generate additional revenue, the New York State legislature amended section 404 to approve the sale of "distinctive regional design plates." N.Y. VEH. & TRAF. LAW § 404-*l*. Though the Department had long issued individual "vanity" plates and other plates specifically authorized by statute, the Commissioner relied on this amendment to institute the large-scale custom plate program at issue here. Dubbed "Take Your Pride for a Ride," the program authorizes the issuance of custom license plate series on the application of non-profit organizations that are registered in New York and fall within eight broad categories: (1) Sports Teams; (2) Causes; (3) Organizations; (4) Counties and Regions of New York; (5) Colleges, Fraternities, and Sororities; (6) Military and Veterans; (7) Emergency Services; and (8) Professions. To apply, an organization is required to submit a description of itself and its cause, a refundable deposit sufficient to finance the initial manufacturing costs, a plate design, and marketing materials. No statute or regulation specific to the program guides the Commissioner's implementation of the program or provides objective criteria for his review of

3

applications.  *See id.* 404-*l*(1) (providing for issuance of "license plate[s] with a distinctive regional design approved by the [C]ommissioner").  Instead, only 15 N.Y.C.R.R. § 16.5 – in relevant part, prohibiting a subset of plates deemed "obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive" – applies.

From 1992 to 2004, when the Department suspended the program, the program issued dozens of custom plate series, spanning topics as diverse as sports, pets, recycling, Freemasonry, the legacy of Theodore Roosevelt, motorcycle and luxury car ownership, horse racing, military service, and professional memberships. Notably, the Commissioner approved plates for both "Cop Shot," an organization providing monetary rewards for information concerning officers harmed in the line of duty whose custom plate depicts a blood splatter, a cross-hair, and the words "SUPPORT POLICE," and the "Union Yes" campaign, with three separate pro-union plates promoting the New York State AFL-CIO, New York State United Teachers union, and unions generally.

Despite the broad array of messages approved for inclusion in the program, the Commissioner thrice rejected Children First Foundation, Inc.'s ("CFF") application for a "Choose Life" plate series.  CFF first applied to the program in December 2001, proposing a plate with the image of two smiling children, drawn in

4

crayon, positioned over the phrase "Choose Life." Though CFF complied with the program's application requirements, the Commissioner denied its proposed plate in February 2002. The only reason provided for the denial was that the Department had rejected a similar "Choose Life" plate in 1998. After CFF requested a fuller explanation, the Department replied that the proposed plate had been deemed "patently offensive," in contravention of 15 N.Y.C.R.R. § 16.5(e). In support of this assertion, the Department cited its purported – albeit, unwritten – practice of avoiding association with "*either* side" of a "political, religious[,] or social issue that has proven to be . . . contentious and divisive."[2] J.A. 409. The Department averred that notwithstanding CFF's "laudable" pro-adoption goals, CFF's "Choose Life" slogan is "more commonly associated with the abortion rights debate" than the issue of adoption, triggering the ban on "patently offensive" plates. The Department also cited a purported risk of "road rage" should the plates be released to the public, as well as a concern that the "Choose Life" plate series "would readily be perceived as

---

[2] The Department's account of this "practice" has shifted during this litigation. While the Department cited only a ban on "contentious" messages in its letter to CFF, in a subsequent affirmation, the Deputy Commissioner and Counsel for the Department described the practice as only approving applications that "refrain[ed] from espousing *an[y]* particular religious, political or social position" (emphasis added). J.A. 1663.

governmental support for one side of a controversy that has existed in this country for several decades."[3]  J.A. 409.

In October 2003, CFF submitted a redesigned plate for consideration.  Though the plate, for the first time, promoted the website "Fund-Adoption.Org," it retained the "Choose Life" slogan.  CFF stated in its application that the slogan was necessary to appeal to pro-adoption, pro-life, and anti-death penalty advocates alike.  The Commissioner again rejected the proposed plate on the basis of the alleged policy against "contentious" messages and, in an apparent effort to emphasize the finality of the denial, cited to CFF his "sole[]" "control over the design, marketing, and issuance of any custom plate series," as well as the lack of any "legal requirement" obliging him to approve applications.  J.A. 439.  CFF submitted another redesigned plate in 2004 but the Commissioner deemed CFF's application already denied.  He suspended the custom plate program altogether shortly thereafter.

Though the Department has denied four "Choose Life" plates pursuant to its alleged policy deeming so-called "contentious" license plates to be "patently

---

[3] Prior to the Commissioner's denial of CFF's custom plate applications, the Department had issued several vanity plates to individuals associated with CFF and bearing messages such as "CHSE LFE."  In addition, at the time the Commissioner denied CFF's third and final application, at least eleven other states offered custom "Choose Life" plates.  *See* Choose Life America, Inc., *Newsletter*, http://www.choose-life.org/ newsletter.php (last visited April 18, 2015).  In his deposition, the Commissioner admitted that he could not recall a single instance of road rage spurred by a custom plate.

offensive" (namely, CFF's three submissions and the 1998 application), the Department points to only one other custom plate application barred by this asserted policy: a "Restore the Wolf" plate supporting repopulation of the Eastern timber wolf in the Adirondacks.

**II.**

Before addressing the constitutionality of New York's custom plate program, it is necessary to determine the type of speech and forum at issue. I, along with the majority and nearly every circuit to consider a similar program, conclude that the speech is private and the forum nonpublic. *See, e.g.*, *Byrne v. Rutledge*, 623 F.3d 46, 53-54 (2d Cir. 2010); *Perry v. McDonald*, 280 F.3d 159, 169 (2d Cir. 2001); *Ariz. Life Coal. Inc. v. Stanton*, 515 F.3d 956, 970-71 (9th Cir. 2008); *Choose Life Ill., Inc., v. White*, 547 F.3d 853, 864-65 (7th Cir. 2008). Both the purpose of the program and the speakers involved compel a finding that the custom plates communicate private speech. The program permits non-profit organizations the opportunity to convert license plates into "'mobile billboard[s]'" to promote their message while raising revenue for their cause. *See Choose Life Ill., Inc.*, 547 F.3d at 862 (quoting *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)). The fact that the message is imparted on government property does not override its private provenance. While a government official must approve the custom plates, nonprofit organizations propose and design

7

them, and vehicle owners choose to display them on their cars. *See Choose Life Ill., Inc.*, 547 F.3d at 863-64. Because "Take Your Pride for a Ride" therefore implicates private and not government speech, the strictures of the First Amendment apply. *See Ariz. Life Coal. Inc.*, 515 F.3d at 963. Further, though the program permits an array of speech, both the quantity of that speech (the text that can fit on a license plate) and access to the program (with all license plate designs requiring approval by the Commissioner) are limited. Because New York did not thus intend to open its custom plate program to "general public discourse and debate," it created a nonpublic forum, permitting more stringent regulation of speech. *See Choose Life Ill., Inc.*, 547 F.3d at 864-65.

At this point in the analysis, however, the majority and I diverge. Confronted with an utterly standardless regime that interprets "patently offensive" to mean "contentious" – and that then deems a "Union Yes" plate benign and "Choose Life" and wolf repopulation plates "especially" controversial – the majority concludes that adequate standards guide the Commissioner's discretion. Maj. Op. at 40. In light of our contrary precedent and the utter malleability of the regulatory regime at issue, I cannot agree.

*   *   *

The danger of content and viewpoint discrimination in violation of First Amendment rights "is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988); *see Roach v. Stouffer*, 560 F.3d 860, 869 (8th Cir. 2009) (discussing this danger in the context of a custom license plate program). Accordingly, where a licensing restriction lacks "'narrow, objective, and definite standards to guide the licensing authority,'" it may be deemed unconstitutional on its face. *Amidon v. Student Ass'n of State Univ. of N.Y.*, 508 F.3d 94, 103 (2d Cir. 2007) (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). This principle protects against two relevant risks: first, self-censorship by "timid speakers who are worried that officials will discriminate against their unorthodox views," and second, that lacking governing standards, a government official may "suppress viewpoints in surreptitious ways that are difficult to detect." *Id.* at 103-04. In either scenario, the opportunity for meaningful judicial review is virtually nil. *Id.*

I agree with the majority that the prohibition against unbridled discretion applies to a nonpublic forum. Maj. Op. at 27. This is because "the dangers posed by unbridled discretion—particularly the ability to hide unconstitutional viewpoint discrimination—are just as present" in these fora. *Child Evangelism Fellowship of MD,*

9

*Inc. v. Montgomery Cnty. Pub. Sch*s., 457 F.3d 376, 386 (4th Cir. 2006). Thus, while government officials may be accorded greater latitude in restricting access to such fora, policies that "permit[] officials to deny access for any reason, or that do[] not provide sufficient criteria to prevent viewpoint discrimination" nonetheless contravene the First Amendment. *Id.* at 387. The instant case illustrates the wisdom of this principle.

The custom plate program here, including the relevant statute, regulation, and supposed historical practice, lack any "narrow, objective, and definite standards" to guide official discretion. *See Amidon*, 508 F.3d at 103. The Commissioner may indiscriminately pick and choose among applicants for custom plates, despite having opened the program broadly to any non-profit organization representing, *inter alia*, a "Cause." Because the regime at issue thus lacks criteria sufficient to prevent viewpoint discrimination, the scheme is facially unconstitutional. *See Lewis v. Wilson*, 253 F.3d 1077, 1080 (8th Cir. 2001) (striking down custom plate program that permitted officials to reject applications that were "contrary to public policy" because "there was nothing in the ordinance to prevent [government officials] from denying . . . plate[s] because of [the applicant's] viewpoint"). I reach this conclusion for the following reasons.

First, as discussed above, the statute. Section 404 places literally no limit – objective or otherwise – on the Commissioner's discretion in reviewing applications, save for a requirement that he collect annual fees. *See* N.Y. VEH. & TRAF. LAW § 404. Instead, section 404 provides only that the Commissioner "may" approve applications and expressly provides that "[n]othing contained in [section 404] shall be construed to require the [C]ommissioner to issue a special number plate or plates."[4] *Id.* § 404(1), (4). Thus, the statute by its plain terms rejects the notion that it may, in any way, be construed to limit the Commissioner's unfettered discretion over the program.

Further, while the Commissioner contends that 15 N.Y.C.R.R. § 16.5(e) limits his freewheeling discretion, the regulation in fact does nothing of the sort. As an initial matter, the regulation (along with the Commissioner's purported historical practice pursuant to this regulation of denying "contentious and divisive" plates as "patently offensive") merely delineates a subset of plates that the Commissioner *cannot* issue. Section 16.5(e) and associated practice pursuant to it offer no direction whatsoever for applications deemed to fall *outside* the regulation's scope. In effect, then, the Commissioner has discretion to deny applications pursuant to 15

---

[4] Section 404-*l*(1) similarly provides merely for the issuance of custom plates bearing designs "approved by the [C]ommissioner" without specification of any standards for approval. N.Y. VEH. & TRAF. LAW § 404-*l*(1).

11

N.Y.C.R.R. § 16.5(e) and his practice under that provision *or for any other reason he desires*.  As the Commissioner himself stated in his letter to CFF, he retains "sole[ ]" "control over the . . . issuance of any custom plate series" and is under no "legal requirement" to approve any application.  J.A. 439.

Consideration of the license plate applications supposedly falling *within* the scope of 15 N.Y.C.R.R. § 16.5(e), moreover, does nothing to alleviate the infirmities of this standardless regime.  Section 16.5(e) is the *only* legal constraint on the Commissioner's discretion over custom plate applications relevant here, yet the regulation merely directs that the Commissioner not issue plates that are, "in [his] discretion[,] . . . , obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive."  15 N.Y.C.R.R. § 16.5(e).  We may assume *arguendo* that the prohibitions on plates that are "obscene, lewd, lascivious, [and] derogatory to a particular ethnic or other group" provide adequate content to guide the Commissioner's decisions, for these terms are not at issue.  The term "patently offensive," however – the term that *is* at issue, because it is the term on which the Commissioner relies in defending his decision to deny CFF's application – is, as the Supreme Court has said, *inherently vague and open-ended*.  *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 873 (1997).  And for this reason, the Supreme Court has

12

concluded that a prohibition on "patently offensive" speech must be limited in some manner to address First Amendment concerns. *See id.* at 873-74.

Section 16.5(e) contains no such limitation. At base, 15 N.Y.C.R.R. § 16.5(e) and its bar on "patently offensive" material is a metric for *any* content deemed objectionable by the Commissioner, imposing no discernible limit on his decision-making process. The regulation is therefore "too vague and pliable to effectively provide the constitutional protection of viewpoint neutrality." *See Amidon*, 508 F.3d at 104; *see also Ariz. Life Coal., Inc.*, 515 F.3d at 973 (striking down Arizona's custom plate program and noting the "potential constitutional problems when government officials are given unbridled discretion in regulating speech, even in limited public fora").[5]

Perhaps the majority is willing to go with me this far. It admits "that [the statute and regulation] afford the commissioner broad discretion" and even concedes that "[t]he ability of [the statute and regulation]—standing alone—to provide an adequate safeguard against the Commissioner's exercise of unbridled

---

[5] Notably, two recent decisions have struck down custom plate programs for relying on similarly vague language. *See Matwyuk v. Johnson*, 22 F. Supp. 3d 812, 824 (W.D. Mich. 2014) (striking Michigan's custom plate program because the program's bar against plates that were "offensive to good taste and decency" "lack[ed] objective criteria, and thus confer[red] unbounded discretion on the decisionmaker"); *Montenegro v. N.H. Div'n of Motor Vehicles*, 93 A.3d 290, 298 (N.H. 2014) (striking down vanity license plate regulation prohibiting plates that are "offensive to good taste" as unconstitutionally vague).

authority is dubious." Maj. Op. at 30. I could not agree more. If this is actually the majority's position, then our disagreement is confined to whether or not the Commissioner's supposed policy of denying applications on the basis of "controversial" or "inflammatory" subject matter constitutes a "well-established" and "uniformly applied" practice that has assumed the force of law and cabined his discretion. However, the majority shifts position from page to page – thus pronouncing its disagreement with CFF's stance that "the statute . . . do[es] not adequately bridle the Commissioner's discretion" after itself admitting as much nine pages earlier. Maj. Op. at 39. The majority also defends the overall structure of the New York regime, which limits the Commissioner's ability to *grant* certain applications, but permits him to *deny* one for any reason.[6] Maj. Op. at 39-40. Most

---

[6] The majority, citing the Supreme Court's decision in *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), and this Court's decision in *Perry*, deems the "permissive nature of the relevant statutory and regulatory provision (*i.e.*, that the Commissioner 'may' issue custom plates but is never required to do so)" irrelevant. Maj. Op. at 39-40. But neither the park ordinance at issue in *Thomas* nor the Vermont vanity plate provision addressed in *Perry* permitted a government official to prohibit speech, as here, in his or her unfettered discretion. The ordinance in *Thomas*, which required individuals to obtain a permit before conducting large-scale events in public parks, limited the Park District's authority to deny a permit to thirteen specified grounds and, as interpreted, permitted the District to waive inadequacies in an application only when doing so would "do no harm to the policies furthered by the application requirements." 534 U.S. at 324-25. Similarly in *Perry*, we recognized that a Vermont vehicle owner at the time was entitled to a vanity plate for an additional fee "as long as the requested combination of letters and/or numbers [met] certain [specified] criteria." 280 F.3d at 163. While a requested plate could be denied if "offensive or confusing to the general public," Vermont, unlike New York, enumerated specific definitions of "offensive" or "confusing" – seven specific definitions, to be precise – to

14

pertinent here, moreover, and despite acknowledging that "the constraints [placed] on the Commissioner" by 15 N.Y.C.R.R. § 16.5(e) are "modest" at best, the majority nonetheless concludes that these constraints "are sufficient to bridle his or her discretion and thus to pass Constitutional muster." Maj. Op. at 39. Before addressing the majority's claim that a well-established and uniformly enforced policy of denying "politically sensitive" and "emotionally charged" custom plate applications "render[s] the Commissioner's discretion adequately bridled," Maj. Op. at 35, then, I elaborate on my reasons for finding 15 N.Y.C.R.R. § 16.5(e) itself so wanting.

As I have already explained, a prohibition on "patently offensive" speech, without further definition or elaboration, lacks sufficient content to satisfy First Amendment concerns. *Reno*, 521 U.S. at 870-71. The majority argues, to the contrary, that "patently offensive" is a familiar term to those in the legal profession, with a readily discernable meaning. Maj. Op. at 39. To the extent this is so, however, such meaning is derived from statutes and regulations that employ the term to refer to certain sexual and excretory content and not to core political expression such as is embodied in CFF's proposed plate depicting smiling children

---

channel its officers' discretion. *Id*. at 172 n.9. Thus, neither *Thomas* nor *Perry* is apposite.

and bearing the message, "Choose Life."[7]  *See, e.g.*, *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 732 (1978).  In the principal cases interpreting "patently offensive," moreover, the phrase has been textually limited to such sexual or excretory content, with the bounds of the phrase clearly delimited by the language of the statute or regulation. *See  Reno*, 521 U.S. at 873 (noting that the test prescribed by *Miller v. California*, 413 U.S. 15, 24 (1973), "reduce[d] the vagueness inherent in the open-ended term 'patently offensive'" by requiring that the material deemed "patently offensive" be "specifically defined by the applicable state law"); *see also Denver Area Educ. Telecomm. Consortium v. F.C.C.*, 518 U.S. 727, 732-33 (1996) (upholding statute that permitted cable operators to block content that they "reasonably believe[d] describe[d] or depict[ed] sexual or excretory activities or organs in a patently offensive manner" (internal quotation mark omitted)); *see Pacifica Found.*, 438 U.S. at 732 (permitting regulation of content that "describe[d], in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs").

---

[7] It is notable – and ironic – that the majority is willing to permit the Commissioner to rely on a phrase typically used to prohibit only the most peripheral speech under the First Amendment to instead suppress core political expression. *Compare F.C.C. v. Pacifica Found.*, 438 U.S. 726, 746 (1978) (deeming vulgar utterances to be of "slight social value"), *with McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (noting that advocacy of political beliefs is "the essence of First Amendment expression").

No such explicit textual limit exists here: 15 N.Y.C.R.R. § 16.5(e) applies to *all* "patently offensive" material, even that outside of the sexual and excretory field. Neither can the canon of *noscitur a sociis* limit the reach of 15 N.Y.C.R.R. § 16.5(e). Although "obscene, lewd, [and] lascivious" suggest reference to sexual content, the inclusion of the phrase "derogatory to a particular ethnic or other group" in the list destroys any commonality that the prohibitions might otherwise have shared. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (stating that, pursuant to the canon of *noscitur a sociis*, a word must be judged by the "company it keeps"); *Harris v. Allstate Ins. Co.*, 309 N.Y. 72, 76 (1955)(same). I therefore see no textual way to limit the regulation to this meaning. And apparently the Commissioner sees none either, as he interprets "patently offensive" to cover speech regarding any "political, religious[,] or social issue" that he deems "contentious and divisive." J.A. 409.

The majority attempts to distinguish the Eighth Circuit's holding in *Roach v. Stouffer* from the instant action. Maj. Op. at 38. There, the court struck a portion of Missouri's custom plate program that permitted a legislative committee to rule on applications because there were "no standards or guidelines whatsoever" to guide the committee's discretion. *Roach*, 560 F.3d at 869. Seizing on this language, the majority insists that *Roach* is inapposite because 15 N.Y.C.R.R. § 16.5(e) provides some limit to the Commissioner's discretion. But the test of unbridled discretion is

17

not whether *any* limit has been placed on official discretion, but whether that limit is "adequate." *See Thomas*, 534 U.S. at 323 (2002); *Child Evangelism Fellowship of MD, Inc.*, 457 F.3d at 384. And the majority's insistence that an adequate legal limit may be divined from the term "patently offensive" as used in 15 N.Y.C.R.R. § 16.5(e) is belied by the Supreme Court's recognition in *Reno* that "patently offensive" alone lacks sufficient content to stanch First Amendment concerns.[8] *Reno*, 521 U.S. at 870-71.

That brings us to the Department's purportedly well-established practice of declining to issue plates on "*either* side" of a "political, religious[,] or social issue that has proven to be . . . contentious and divisive." J.A. 409. The majority attempts to distinguish *Roach* on this ground as well, by stating summarily that not only the regulation, but "the DMV's well-established and consistently applied policy and practice provide the guidelines that were lacking [there]." Maj. Op. at 38. But this argument, too, is insubstantial. At the start, any practice pursuant to 15 N.Y.C.R.R. § 16.5(e) speaks only to those applications the Commissioner *must* deny and not to his broad discretion to deny other applications for any reason whatsoever. But even

---

[8] To the extent the majority is attempting to impose its own construction of "patently offensive" onto 15 N.Y.C.R.R. § 16-5(e) to salvage New York's custom plate program, moreover, "a federal court cannot supply a binding construction of a state or local ordinance[;] the limiting construction . . . must come, if at all, from the [state agency] or a state court." *See Beal v. Stern*, 184 F.3d 117, 127 n.7 (2d Cir. 1999).

18

if this were not the case, a limiting practice not to be found in the text of the relevant statute or regulation may serve as a narrowing construction only when such practice is "well-understood and uniformly applied" such that it has taken on "virtually the force of a judicial construction." *City of Lakewood*, 486 U.S. at 770 n.11. There is nothing in this record – nothing – beyond the Commissioner's self-serving statements to support the conclusion that such a practice is present in this case.

First, the Department itself lacks a coherent understanding of the scope of its supposed practice. While the Commissioner stated in his letter to CFF that the practice bars "contentious" speech on political, religious, and social issues, his Deputy Commissioner and Counsel described the practice as banning *all* applications that espouse a "religious, political or social position," whether or not these positions are controversial or divisive. J.A. 1663. The majority disregards the Commissioner's deputies, reassuringly (albeit unconvincingly) intoning that the Commissioner's practice under 15 N.Y.C.R.R. § 16.5(e) is "not a black box," but is robustly "transparen[t]." Maj. Op. at 36. It was wise to sweep the deputies under the rug. For the deputies' description of a supposedly well-understood practice of denying applications that espouse *any* political or social position would doubtless be a source of bemusement to many New Yorkers, particularly those lucky enough to drive vehicles with custom license plates *approved* by the Commissioner and

19

espousing "political [and] social position[s]" in favor of such varied topics as recycling, horse racing, and the ideals of Martin Luther King, Jr.

It is bad enough that the Commissioner and his deputies cannot consistently describe the supposedly "well-understood and uniformly applied practice," *see City of Lakewood,* 486 U.S. at 770 n.11, on which they rely to lend content to the concept of "patently offensive."  Equally damning, however, the Commissioner's supposedly uniform practice of denying "controversial" custom plate applications pursuant to his purported "policy" is limited to the spurned "Choose Life" and "Restore the Wolf" plates.  The Commissioner's denial of two plates on two narrow topics, in light of his approval of dozens of other designs and the evident contradictions in the record as to just what his policy is, hardly give rise to a well-established practice sufficient to provide the public with notice of the parameters of the program.  In fact, on this record, it appears that the Department's only well-established practice is to reject license plates bearing the phrase "Choose Life."

The majority attempts to shore up the "well-established" nature of this practice by pointing to the Commissioner's denial of one vanity plate deemed patently offensive, with the message "RU486."  Maj. Op. at 32.  At the start, the sole support for the proposition that the "RU486 " plate was denied pursuant to this particular policy comes from the Commissioner's deposition – meaning there is no

20

contemporaneous documentary evidence cited to corroborate this claim. Regardless, even assuming that this denial is properly considered to stem from the alleged policy banning controversial speech, it does not affect the analysis. Given the dozens of custom plate series approved by the Commissioner and the untold number of vanity plates issued (including, tellingly, plates to individuals associated with CFF and bearing messages such as "CHSE LFE") the denial of four sequential "Choose Life" applications, a "Restore the Wolf" plate, and one vanity plate does not a well-established practice make.

Moreover, even if the alleged practice *were* well-established – and it is not – it would still prove too vague to imbue section 404 and 15 N.Y.C.R.R. § 16.5(e) with any content. For indefinite bans on "contentious" or "controversial" subject matter have long been disdained by the courts. *See, e.g.*, *Ariz. Life Coal. Inc.*, 515 F.3d at 972 ("[A] ban on controversial speech may all too easily lend itself to viewpoint discrimination." (internal quotation marks and brackets omitted)); *United Food & Commercial Workers Union v. S.W. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 361 (6th Cir. 1998) ("We believe any prohibition against 'controversial' advertisements unquestionably allows for viewpoint discrimination."); *Planned Parenthood Ass'n v. Chi. Transit Auth.*, 767 F.2d 1225, 1230 (7th Cir. 1985) ("We question whether a regulation of speech that has as its touchstone a government official's subjective

21

view that the speech is 'controversial' could ever pass constitutional muster."). Plainly, such subjective limitations provide little notice to applicants of what speech may or may not be permitted, and too easily allow a ban on "contentious" material to shift into a ban on "unpopular" speech.[9]

The Department's own incoherent practice pursuant to its supposed policy proves the point. *Cf. City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) ("Exemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the government's rationale for restricting speech in the first place."); *Lewis*, 253 F.3d at 1080 (finding that government's shifting rationale for rejecting plate applications supported unconstitutionality of program). Despite rejecting the "Choose Life" and "Restore the Wolf" plates on the ground that they were "contentious and divisive," the Commissioner had no trouble approving three separate "Union Yes" plates, along with a custom plate bearing the legend "Support

---

[9] An article in the record that details the Commissioner's denial of the "Restore the Wolf" plate illustrates this concern. The article states that the idea for the plate originated after the applicants noticed other "cute" license plates around New York. Residents of the Adirondacks, hunters, interest groups, and local government officials, however, were vocally opposed to the restoration cause, with many expressing their opposition in writing to the Commissioner. Following the denial, the Commissioner explained only that the custom plate program was not intended to "be bumper stickers for causes." J.A. 1666. Of course, the program was created to do precisely that: permit non-profit organizations representing "Causes" to "Take [their] Pride for a Ride." But while it was within the Commissioner's discretion to throw open the doors of the custom plate program to such applicants, the First Amendment forbids him from now indiscriminately approving and denying plates submitted by those who accept his invitation.

Police" and featuring a cross-hair and blood splatter. The Commissioner argues that there is no inconsistency in these decisions, because abortion and wolf restoration are in a different class, in terms of the societal debate that they provoke. But it will no doubt come as a surprise to many that the national debate over right-to-work laws, municipal labor contracts, public school reform, and union campaign spending has fallen to the wayside – or that a license plate depicting a blood splatter and urging support for law enforcement is devoid of controversy.

The Supreme Court, as *City of Lakewood* reminds, "has long been sensitive to the special dangers inherent in a law placing unbridled discretion directly to license speech . . . in the hands of a government official." *City of Lakewood*, 486 U.S. at 767-68. The majority faithfully intones *City of Lakewood*'s words – noting that courts will read a statute or regulation in light of an unstated practice only when this practice is "well-understood and uniformly applied" so as to have "virtually the force of a judicial construction." Maj. Op. at 28 (quoting *City of Lakewood*, 486 U.S. at 770 n.11). The majority  faithfully recites the words, but somehow misses their meaning.

Thus, it argues with regard to the "Union Yes" plates that "there is no basis to conclude that the Department failed to apply [its] policy against creating plates that touch upon contentious political issues" when considering the pro-union designs "as opposed to having applied the policy and merely reaching a different

23

result than it did with the 'Choose Life' plate." Maj. Op. at 33. This, however, is precisely the point: that a policy that takes two issues of similar valance and rejects one while blessing the other thrice over, based on agency employees' subjective views that one is more divisive than the other, self-evidently places no meaningful constraint on the Commissioner's discretion. I do not need to show that the Commissioner failed to *apply* his supposed policy against controversial issues to the three applications for "Union Yes" plates—although, notably, there is no evidence in the record that he did. The problem is that, even applying the policy, the Commissioner was free to grant or deny those applications according to his whim. The majority cautions that "[i]t is not our place to evaluate and weigh the various hot button issues of our time against one another, assigning to each a specific place in the landscape of public debate in this country." Maj. Op. at 33. Indeed, it is not our place – and neither should it be the Commissioner's. The Constitution does not permit it.

At base, the statute, regulation and practice here are so malleable as to defy definition. To be clear, this is not to suggest that limits *cannot* be placed on the content of custom license plates, as our decision in *Perry* makes clear.[10] But the

[10] As already noted, we determined in *Perry* that Vermont's statutory ban on "offensive" or "confusing" plates did not grant officials unfettered discretion because the regulation governing the ban "limit[ed official] discretion by specifying content." *Perry*, 280 F.3d at 172. Even the most cursory examination of the Vermont regulation – which prohibited,

24

Commissioner may not pick and choose what custom plates to permit, based solely on his subjective judgment regarding the degree to which any given political, religious, or social issue is "inflammatory" at any given time. For nowhere do the statute, regulation, or historical practice prohibit "inflammatory" custom plates. (And, indeed, the Commissioner *approved* "Choose Life"-themed vanity plates before denying CFF's applications, only underscoring the incoherence that this regime permits.)

The scheme fails to provide the "narrow, objective, and definite" restraints demanded by this Circuit's First Amendment jurisprudence. *See Amidon*, 508 F.3d at 103. An application for a license plate supporting the minimum wage, the flat tax, or immigration reform would undoubtedly touch upon the sort of "contentious" "political, religious[,] or social issue" that the Commissioner deems potentially to fall within the scope of 15 N.Y.C.R.R. § 16.5(e). But it would pervert First Amendment principles (and signal too forgiving an attitude on the part of a reviewing court) to uphold a scheme in which the Commissioner could, in his unfettered discretion,

_____

*inter alia*, "[c]ombinations of letters, or numbers that connote, in any language": "breast, genitalia, pubic area, or buttocks," "any illicit drug, narcotic, intoxicant, or related paraphernalia," "disability status," "race," or "political affiliation," *see id.* at 172 n.9 (quoting VT. CODE. R. 14-050-025 I.(f)), is sufficient to suggest the infirmities in New York's standardless ban on "patently offensive" speech.

25

deem such an application "patently offensive," as compared to "Support Police" and "Union Yes." So, too, for a plate depicting two children, a beaming sun, and bearing the message, "Choose Life."

**III.**

Taking the Department at its word, the operation of its custom plate program looks something like this: First, the Commissioner deciphers how a proposed plate's message will be interpreted by public. Then, he determines whether the message is sufficiently "offensive" to merit rejection. To do so, he estimates whether the message will be greeted as "contentious" by members of the public. At no point in this process is the Commissioner guided by objective criteria, nor need he be. As the Commissioner reminded CFF, he retains "sole[]" "control over the . . . issuance of any custom plate series" and is under no "legal requirement" to approve any application.

In sum, New York State has opened a forum for speech and permitted its Commissioner unbridled discretion to censor messages therein, risking self-censorship by applicants and shielding the Commissioner's decisions from any meaningful judicial review. While the legislature might permissibly limit the content permitted on custom license plates, or even the Commissioner if his

authority were appropriately constrained, the Commissioner may not do so carte blanche. The current scheme, "involv[ing the] appraisal of facts, the exercise of judgment, and the formation of an opinion, by the licensing authority, [presents a] danger of censorship and of abridgment of our precious First Amendment freedoms [that] is too great to be permitted." *See Forsyth*, 505 U.S. at 131 (internal quotation marks and citation omitted). Accordingly, I would affirm the district court's judgment on the ground that New York State's custom plate program inadequately restrains the Commissioner's authority, and I would enjoin the Department from issuing custom plate series under the program.

* * *

I have my doubts that "a regulation of speech that has as its touchstone a government official's subjective view that the speech is 'controversial,'" *Planned Parenthood Ass'n*, 767 F.2d at 1230, could ever result in a practice that is consistent with the First Amendment. *See also Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 548 n.9 (1980) (Stevens, J., concurring) (noting that use of "the 'controversial' nature of speech as the touchstone for its regulation threatens a value at the very core of the First Amendment"). Given my conclusion that New York's custom plate program fails to pass constitutional muster on its face, however,

27

I need not and so do not consider this question further, nor the broader question whether the Commissioner might permissibly deny "Choose Life" plates under some different statutory or regulatory regime.

The majority embraces the Commissioner's claim that it was principally safety concerns that motivated his denial of CFF's plate. The record contains scant (if any) evidence supporting the reasonableness of such concerns. One need cast no aspersion on the Commissioner, however, to realize that the true motivation for his decision is impossible reliably to ascertain, given his free-wheeling authority over the custom plate program. And this returns us to the basis for holding New York's program unconstitutional on its face. As the Supreme Court has said:

> [T]he absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.

*City of Lakewood*, 486 U.S. at 758. The Court in *Lakewood* warned that without standards to limit discretion in the sensitive First Amendment context, "the licensor's action[s] [are] in large measure effectively unreviewable." *Id.* at 759. That

28

is the case here, and for this reason, I would deem New York's custom plate regime to be unconstitutional on its face.